[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 121.]

THE STATE EX REL. THE TIMKEN COMPANY, APPELLANT, *v.* HAMMER ET AL.,

APPELLEES.

[Cite as *State ex rel. Timken Co. v. Hammer*, 2002-Ohio-1754.]

*Workers' compensation—Violation of a specific safety requirement—Applicability of Ohio Adm.Code 4121:1-5-13(F)(1)(d) to straddle truck used to carry loads of pipe, lumber, and other long materials.*

(No. 2000-2292—Submitted January 29, 2002—Decided May 1, 2002.)

APPEAL from the Court of Appeals for Franklin County, No. 99AP-905.

_____

**Per Curiam.**

{¶1} In the early morning hours of June 3, 1995, longtime employee Jimmy J. Mujais, Jr., was moving steel bars with a straddle truck at the Gambrinus Steel Mill of his employer, the Timken Company, appellant. A straddle truck is designed to carry loads of pipe, lumber, and other long materials. With its wide wheelbase and high clearance, it moves materials—as the name indicates—by straddling the material and hauling it in the large undercarriage located beneath the elevated cab.

{¶2} On this particular vehicle—the number 40 Hyster—the cab was on the right side. There was a mirror on the cab's left side, but not the right. Claimant's right-side view was further obstructed by Timken's addition of parts to the vehicle's right side.

{¶3} Shortly after 6:00 a.m., Mujais was moving steel from the plant to an outdoor location. He was moving approximately three to four miles an hour as he neared the door. As he approached, he noticed two men to his right. As he made the right turn through the door, his view on that side was blocked by the parts added

and he lost sight of the men. He completed the turn only to be flagged down by a frantic coworker who told him that he had just run over someone.

{¶4} Fellow employee Carl W. Hammer died of injuries received in that accident. After a workers' compensation claim was allowed, his widow, Mabel, appellee-claimant herein, sought an additional award, alleging that Timken had committed several violations of specific safety requirements ("VSSR"). On January 5, 1998, appellee Industrial Commission of Ohio, through a staff hearing officer ("SHO"), granted the application.

{¶5} Timken successfully moved for rehearing based on newly obtained evidence. The second hearing occurred on January 25, 1999, and in a nine-page, single-spaced order, a second SHO found a violation of Ohio Adm.Code 4121:1-5-13(F)(1)(d), which reads:

{¶6} "(F) Powered industrial trucks.

{¶7} "(1) General requirements.

{¶8} "* * *

{¶9} "(d) Trucks shall not be altered so that the relative positions of the various parts are different from what they were when originally received from the manufacturer, nor shall they be altered either by the addition of extra parts not provided by the manufacturer or by the elimination of any parts, except as provided in paragraph (F)(1)(e) of this rule. Additional counterweighting of fork trucks shall not be done unless authorized by the truck manufacturer."

{¶10} In great detail, the SHO addressed the two primary issues presented—the applicability of the specific safety requirement and the causal relation between the undisputed alterations and the fatal accident. The applicability of the rule was in dispute because of the absence of a definition within the Ohio Adm.Code for "powered industrial truck." As a result, Timken argued that (1) Ohio Adm.Code 4121:1-5-13(F) applied exclusively to forklifts; (2) absent an Ohio Adm.Code definition, the commission was required to use the definition supplied

by the American Society of Mechanical Engineers ("ASME"), which, according to Timken, excluded a straddle truck from its definition of "powered industrial truck"; and (3) the Occupational Safety and Health Administration ("OSHA") did not consider the straddle truck to be a powered industrial truck.

{¶11} The commission rejected each contention. Addressing Timken's initial argument, the commission wrote:

{¶12} "If the Industrial Commission had intended to limit 4121:1-5-13(F) only to 'forklifts' then the section would be entitled 'forklifts' and not 'powered industrial trucks.' One should note that sections preceding subsection (F) and those subsequent to it list different types of vehicles. For instance, subsection (C) is entitled 'general requirements for motor vehicles and mobile mechanized equipment[.]' Subsection (D) refers to haulage vehicles and high lift rider trucks. Subsection (E) is entitled to 'Motor vehicles used to transport employees.' While the employer is correct in pointing out that 4121:1-5-13(F)(1)(d) contains a specific reference to 'fork trucks,' the Staff Hearing Officer rejects the employer's contention that the reference to 'fork trucks' means that this particular subsection applies exclusively to 'fork trucks.' The Staff Hearing Officer finds that the reference to 'fork trucks' is meant to be included in the general category of 'Powered Industrial Trucks,' given the fact the section is not entitled 'fork trucks' or 'forklifts.' It is reasonable to assume that due to this detailed list of coverage had the drafters of this rule intended 4121:1-5-13(F)(1)(d) to apply only to forklifts it would have so stated."

{¶13} As to Timken's second argument, the commission rejected the assertion that it was required to use the ASME definition. Even if it were to use the definition, the commission rejected as conclusory and without foundation testimony from a Timken witness that indicated that a straddle truck was excluded from the ASME definition. To the contrary, it concluded:

{¶14} "It should be noted that Section B56-1-1993 entitled 'Safety Standard for Low Lift and High Lift Trucks Appendix,' on page 49 contains definitions of 'forklift' and 'powered industrial truck.' The definitions are as follows:

{¶15} " 'Truck-forklift—a self loading truck, equipped with load carriage and forks for transporting and tiering loads.'

{¶16} " 'Truck-powered industrial—a mobile power propelled truck used to carry, push, pull, lift, stack or tier material.'

{¶17} "The Staff Hearing Officer finds the fact that ASME provided two different definitions for 'forklift' and 'powered industrial truck' defeats the employer's earlier argument that 'powered industrial truck' is limited to 'forklift truck.' It appears that powered industrial trucks were meant to cover a much broader spectrum of vehicles than forklifts. On file is page 26 of an industry instruction manual (chapter six-powered industrial trucks) which devotes an inclusionary section to 'straddle trucks.' P. 229 of that same manual indicates that a straddle truck is an industrial truck used to lift and carry large loads. The Staff Hearing Officer finds that 'straddle truck' fits within the definition of a 'powered industrial truck' since it is a 'mobile powered propelled truck used to carry, push, pull, lift, stack or tier material.'

{¶18} "* * *

{¶19} "* * * [T]he Staff Hearing Officer further notes that the ASME B56.1 Standard cited by the employer's counsel would not apply to the Hyster straddle truck because the straddle truck has a 60,000 pound capacity (per the 11/14/1997 affidavit of Robert D. Newman) and the ASME B.56.1 'scope' section states that the scope of ASME 56.1 only applies to powered industrial trucks with a capacity up to 22,000 capacity."

{¶20} A second ASME description was also discarded:

{¶21} "The employer further relies on ASME interpretation 1-28 for its proposition that the straddle truck in question is not a 'powered industrial truck.'

**{¶22}** "This interpretation provides in part:

**{¶23}** " 'Question:   What ASME or ANSI standards would apply to a machine that fits the following description?

**{¶24}** " 'The machine is used for moving *containers* between railroad flatbeds[,] trailer trucks, and flatbed trailer trucks where these *large containers* are moved by rail and then by truck.  The function of this piece of equipment is to lift and move *containers approximately 35 to 40 feet in length* between flatbed railroad cars and flatbed trailer trucks.  These containers are quite heavy, weighing between 60,000 and 70,000 pounds.

**{¶25}** " 'This piece of equipment is powered by a diesel engine.  It has hydraulic cylinders to operate the arms that *lift and lower the containers.*  The containers are either *lifted by attachments to the top of the container or lifted by hanging hooks that connect to the underside of the containers.*

**{¶26}** " 'The containers, once attached to the machine, are lifted only about 5 ft. normally.  This piece of equipment can travel at a speed of approximately 15 mph and is not normally used on highways but is used on railroad transfer cars.

**{¶27}** " 'Reply:  It appears that the piece of equipment described above is a type of straddle carrier or van container handler.  Neither of these types of vehicles is covered by the B56 Standards and we are not aware of any other standards that would apply.' "

**{¶28}** "The Staff Hearing Officer finds the employer's reliance on this interpretation to be misplaced.  The straddle truck that the employer uses carries large sections of steel, not containers.  It carries its load on internal lifting shoes and guides rather than cables.  See the Specification Sheet, dated October 1994, for the straddle truck.  The Staff Hearing Officer also finds that Interpretation 1-28 only applies to a container carrier capable of moving containers that are 35-40 feet long.  The straddle truck in question is only 20 feet long."  (Emphasis added by SHO.)

**{¶29}** Turning finally to Timken's OSHA assertion, the commission found:

**{¶30}** "Lastly, the employer asserts, as one of its defenses, that the Industrial Commission should rely upon the outcome of the OSHA investigation with regard to the classification of the Hyster straddle at issue herein.  It should be noted that OSHA initially issued two citations and levied a fine of $10,000.  It appears that the OSHA citations were based upon a finding that the straddle truck in question was a 'powered industrial truck.'  The employer asserted, on several occasions, the OSHA citation was vacated *because* OSHA conceded that the Hyster straddle truck was not a powered industrial truck.  * * *

**{¶31}** "* * *

**{¶32}** "* * * The Staff Hearing Officer finds this assertion to be disturbing for the simple reason that it is, at best, false, and, at worst, intentionally misleading.  The Staff Hearing Officer finds that OSHA has *never* vacated the aforementioned citations based upon a finding that the straddle truck was not a powered industrial truck.  * * * [T]he citations were vacated for an entirely different reason." (Emphasis sic.)

**{¶33}** Having found that the rule applied to the straddle lift and that it was violated by the undisputed modification of the straddle truck, the commission turned to proximate cause.  Based on the testimony of driver Jimmy Mujais, the commission indeed found the requisite connection between the violation and the death, and ordered the maximum award.  Reconsideration was denied.

**{¶34}** Timken petitioned the Court of Appeals for Franklin County to issue a writ of mandamus ordering the commission to vacate its order.  The court of appeals rejected each of Timken's arguments and denied the writ, prompting this appeal as of right.

**{¶35}** All agree that the straddle truck had been altered.  Timken challenges the specific safety requirement's applicability to the straddle truck and, alternatively, the finding of proximate causation.  Both objections lack merit.

**{¶36}** As to the former, Timken makes two arguments. Absent an Ohio Adm.Code definition for "powered industrial truck," the commission, according to Timken, was compelled to accept ASME's definition. This is false. Where a relevant term is left undefined by the safety code, its interpretation rests solely with the commission. While the commission may rely on an outside definition, it is not required to do so. *State ex rel. Go-Jo Industries v. Indus. Comm.* (1998), 83 Ohio St.3d 529, 534, 700 N.E.2d 1264. In the commission's excellent order, as quoted earlier, the commission set forth the reasoning it used to determine that the straddle truck was a "powered industrial truck." It also went a step further in painstakingly explaining why it considered Timken's interpretation and counterarguments unpersuasive. No more is required.

**{¶37}** Timken also argues that the points it raised created a reasonable doubt as to the regulation's applicability and, in so doing, required the commission to interpret the rule in favor of the employer. Timken states a correct proposition of law that does not apply here. Because an award for a VSSR is a penalty, all reasonable doubts as to applicability must indeed be resolved in the employer's favor. *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216. Timken, however, incorrectly presupposes that the introduction of *any* counterargument or contrary interpretation automatically raises a reasonable doubt as to interpretation. This obviously is not so. In this case, the commission found that Timken's arguments lacked merit and did not, therefore, raise any doubt as to the applicability of the code section. Accordingly, this contention, too, is rejected.

**{¶38}** Timken's remaining propositions assume that the specific safety requirement is applicable. It initially argues that (F)(1)(d)'s prohibitions are so vague as to offend due process. Specifically, Timken argues that nothing in the specific safety requirement addresses line-of-sight hazards and that the rule therefore "fails to plainly apprise relator of its legal obligation, to wit, that it must

protect its employees against whatever dangers may be posed by a partially obstructed line of sight."

**{¶39}** This assertion is meritless. Ohio Adm.Code 4121:1-5-13(F)(1)(d) clearly prohibits the addition of any extra parts except as provided in section (F)(1)(e). Timken's additions did not fall under (F)(1)(e), so Timken was on clear notice that its alteration violated the specific safety requirement. It does not matter that the hazard posed was not enumerated. What matters is that the proscribed conduct was clearly set forth—i.e., acceptable alterations were enumerated and Timken's was not among them.

**{¶40}** Finally, Timken contests the finding of a causal relation between the alterations and the accident. Its argument is based on the fact that no one could actually explain how the decedent happened into the path of a straddle truck. That is immaterial. As stated by the commission, the straddle truck's driver testified that the added equipment caused him to lose sight of the decedent. Certainly, the commission was entitled to infer that had the driver been able to see the decedent, he would have made an effort to avoid him. It was not, therefore, an abuse of discretion to conclude that the driver's inability to see the decedent—which was caused by Timken's add-on equipment—resulted in the accident.

**{¶41}** The judgment of the court of appeals is affirmed.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

————————————

Day, Ketterer, Raley, Wright & Rybolt, Ltd., Darrell N. Markijohn and Stephen E. Matasich, for appellant.

William F. Mikesell, for appellee Mabel Hammer.

Betty D. Montgomery, Attorney General, and Cheryl J. Nester, Assistant Attorney General, for appellee Industrial Commission of Ohio.

January Term, 2002

---