[Cite as *State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.*, 2013-Ohio-4381.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel. Precision Steel     :
Services, Inc.,

                               :

        Relator,

                               :

v.                                      No. 11AP-1083

                               :

The Industrial Commission of Ohio           (REGULAR CALENDAR)
and Melvin E. Meyers,                  :

        Respondents.                :

---

D E C I S I O N

Rendered on October 3, 2013

---

*Willacy, LoPresti & Marcovy, Salvatore J. LoPresti, Timothy A. Marcovy,* and *Michael S. Lewis,* for relator.

*Michael DeWine*, Attorney General, and *John R. Smart*, for respondent Industrial Commission of Ohio.

*Vanderhorst & Burgy LLC, Michael A. Vanderhorst,* and *Kristin L. Burgy*, for respondent Melvin E. Meyers.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, Precision Steel Services, Inc. ("Precision"), commenced this original action seeking a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate an award of additional workers' compensation benefits to respondent Melvin E. Meyers ("claimant"). The commission found that claimant was entitled to additional benefits based on Precision's violation of a specific safety requirement ("VSSR"). We assigned the matter to a magistrate of this court pursuant to Civ.R. 53(D) and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued a decision, attached hereto as an appendix, which includes findings of fact and

conclusions of law, as well as a recommendation that this court grant a writ of mandamus requiring the commission to vacate its order and issue a new order.

{¶ 2}   We adopt the magistrate's findings of fact as set forth in ¶ 64 through ¶ 94 of the appendix to this decision, but we do not accept in full the magistrate's conclusions of law.   Rather, for different reasons, as discussed below, we grant a writ of mandamus ordering the commission to vacate its prior order and issue a new order adjudicating claimant's VSSR application.

## I.   Summary of Facts and Commission Proceedings

{¶ 3}   Stated succinctly, the facts are that, on March 1, 2008, claimant suffered injuries while welding a 1,200-pound metal part.   Claimant attempted to use an overhead crane to move the part so that he could weld its reverse side when both the part and a large electromagnet ("magnet") holding the part fell, crushing claimant's left hand necessitating its amputation.

{¶ 4}   The stipulated evidence does not include photos of the crane as configured at the time of the incident, and the record is not entirely clear as to the exact configuration of the devices used to attach the magnet to the crane's upper hook at that time.[1]   The parties are in agreement, however, that the magnet was connected to an upper hook of the overhead crane by a wire rope or cable that had loops, or "eyes," at both ends.   The upper hook of the crane fit into the loop at the top of the wire rope.   A smaller hook at the bottom of the wire rope (the "bottom hook") connected the magnet to the wire rope.   The claimant prepared drawings of these attachments showing the bottom hook as a component that itself consisted of two loops, one of which fit into the bottom eye of the wire rope and the second of which fit into the top of the magnet.

{¶ 5}   The Ohio Bureau of Workers' Compensation Safety Violations Investigation Unit ("SVIU") investigated the incident.   SVIU investigator Fred M. Freeman reported that the employer had initially described the cause of the accident as the fact that "the safety latch attaching the magnet to the metal hook was missing at the time of the incident."   Freeman's  observation is consistent with the premise that a safety latch should have been in place on the bottom hook at the time of the accident.

---

[1] The parties have submitted a joint stipulation of evidence that does not include all the exhibits produced at the evidentiary hearing before the staff hearing officer.  In reviewing the evidence, we are also hampered by the substandard quality of the photographs reproduced in the joint stipulation of evidence.

{¶ 6} Investigator Freeman also included in his report an affidavit executed by claimant stating that the "lifting eye of the magnet slipped off the hook on the bottom of the wire rope causing metal part and magnet to fall on top of my hand." (Meyers affidavit, 2.) The claimant also suggested that the bottom hook should have been equipped with a safety latch, which would have prevented the eye of the magnet from slipping off the hook. The claimant testified that his injury occurred "because the hook on the bottom of the wire rope did not have a safety latch to keep the magnet from coming off of it." (Meyers affidavit, 2.) Indeed, Precision's operation manager acknowledged at the hearing that "the manufacturer" had recommended that a safety latch should always be used when the magnet was attached to a hook and being used to lift a load. He did not, however, identify whether "the manufacturer" was the manufacturer of the overhead crane, the bottom hook, or the the magnet.

{¶ 7} The commission awarded claimant workers' compensation benefits for his injuries. On February 12, 2010, claimant filed an application for an additional VSSR award for violation of a specific safety requirement under the provisions of the Ohio Constitution, Article II, Section 35. A staff hearing officer ("SHO"), heard the matter and issued an order on August 9, 2011, the text of which is reproduced in the Magistrate's Decision at ¶ 89. The SHO found that "the Injured Worker's injury was due to the Employer's failure to comply with [Ohio Adm.Code] 4123:1-5-14(G)(1) and 4123:1-5-15(B)." (Aug. 9, 2011 Corrected Order, 1.)

{¶ 8} As to the first of the two rules, i.e., Ohio Adm.Code 4123:1-5-14(G)(1), the SHO found that "the crane causing [claimant's] injury had a defective safety device [and] that [t]he defect was that the safety latch was not present on the crane hook." (Corrected Order, 2.) This finding reflected the SHO's determination that the bottom hook was a part of the overhead crane. The SHO further found that "the magnet would not have slipped off if a safety hook had been present" and that "the safety latch was missing at the time of Injured Worker's injury and therefore the equipment should have been repaired or replaced according to [Ohio Adm.Code] 4123:1-5-14(G)(1)." (Corrected Order, 2-3.) The SHO further noted that "the testimony of the Employer's witnesses do not support that a safety latch was present at any time before or at the time of the industrial injury." (Corrected Order, 3.)

{¶ 9}   As to the second of the two rules, i.e., Ohio Adm.Code 4123:1-5-15(B), the SHO found that "the crane should have been removed from service and not in use, as required by [Ohio Adm.Code] 4123:1-5-15(B), pertaining to Hoisting and Haulage Equipment * * * [because] the lack of a safety latch amounted to a defect which weakened the equipment (the magnet came off because a safety latch was missing)." (Corrected Order, 3.) On October 25, 2011, the commission denied Precision's request for reconsideration and rehearing of the SHO's order.

{¶ 10} Precision thereafter filed this original action, claiming that the commission abused its discretion in granting claimant an additional award of VSSR benefits.  It sought a writ ordering the commission to vacate its order and to enter an order denying claimant's application for additional VSSR benefits, claiming that Precision had not violated either of the two rules. It further challenged the commission's implicit finding that the two rules constituted specific, as opposed to general, safety requirements, noting that neither rule specifically required the use of a safety latch when attaching a magnet to a crane hook.

## II. The Magistrate's Decision

{¶ 11} In reviewing the parties' arguments, the magistrate noted the well-settled principle that a "VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer." (Magistrate's Decision, ¶ 101.) The magistrate further found it to be "firmly established that the determination of disputed factual situations as well as the interpretation of a specific safety requirement is within the final jurisdiction of the commission, and subject to correction in mandamus only upon a showing of an abuse of discretion." (Magistrate's Decision, ¶ 102.)  Moreover, the commission must interpret its rules reasonably and "may not effectively rewrite its own safety rules in the guise of interpreting them."  (Magistrate's Decision, ¶ 103.).

{¶ 12} The first rule at issue in this case is Ohio Adm.Code 4123:1-5-14, which establishes requirements for power-driven cranes and hoists.  The  magistrate disagreed with the SHO's finding that Ohio Adm.Code 4123:1-5-14(G)(1) applied to the case. The magistrate instead concluded that subsection (G) of the rule, which mandates repair or replacement of "defective safety devices or load-carrying equipment," did not apply in this

case because the word "equipment" in subsection (G) included only "the *specifically identified devices and equipment found throughout paragraphs (C) through (F)* at Ohio Adm.Code 4123:1-5-14." (Emphasis added.) (Magistrate Decision, ¶ 120). The magistrate concluded that Ohio Adm.Code 4123:1-5-14(G)(1) did not apply because "a hook safety latch is not among the devices and equipment specified throughout (C) through (F)." (Magistrate's Decision, ¶ 120.)

{¶ 13} The second rule at issue in this case is Ohio Adm.Code. 4123:1-5-15, titled "hoisting and haulage equipment," which provides:

> (A) Equipment such as slings, hoisting or haulage lines, wire rope, natural or synthetic fiber rope, chain metal mesh and synthetic web, and attachments used to handle material or equipment shall be used in accordance with the manufacturer's recommendations.
>
> (B) Equipment shall be removed from service when there is evidence of a defect, damage, or distortion which may weaken such equipment.

{¶ 14} The magistrate concluded that the SHO was required to consider the definition of equipment provided in subsection (A) of the hoisting and haulage equipment rule—even though the VSSR application referenced only subsection (B) of the rule—because Precision "cannot have violated the safety rule [in subsection *(B)* of Ohio Adm.Code. 4123:1-5-15] if the hook or hook safety latch is not the '[e]quipment' defined by Ohio Adm.Code 4123:1-5-15 *(A)*." (Emphasis added.) (Magistrate's Decision, ¶ 124.) The magistrate further concluded that the SHO "failed to determine whether the hook or hook safety latch at issue can be viewed as '[e]quipment' within the meaning of Ohio Adm.Code 4123:1-5-15(A) of the rule." (Magistrate Decision, ¶ 124.)

{¶ 15} In summary, the magistrate issued a three-part decision, recommending that we order the commission to (1) vacate its prior order; (2) enter a new order finding that Precision did not violate Ohio Adm.Code 4123:1-5-14(G)(1) (the power-driven crane and hoist rule); and (3) reconsider whether the lack of a hook or hook safety latch between the magnet and the crane hook involved "equipment," as defined in Ohio Adm.Code 4123:1-5-15(A) (the hoisting and haulage equipment rule).

## III. Parties' Objections and Analysis

{¶ 16} Claimant, Precision, and the commission have all filed timely objections to the magistrate's decision. In considering these objections, we are mindful, as was the

magistrate, that the Supreme Court of Ohio has characterized a VSSR award as a penalty. *State ex rel. Glunt Industries, Inc. v. Indus. Comm.*, 132 Ohio St.3d 78, 2012-Ohio-2125, ¶ 12, citing *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170, 172 (1989). The commission, however, has discretion to interpret its own rules. *State ex rel. Devore Roofing & Painting v. Indus. Comm.*, 101 Ohio St.3d 66, 2004-Ohio-23, ¶ 22, citing *State ex rel. Harris v. Indus. Comm.*, 12 Ohio St.3d 152, 153 (1984). If, however, the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail. *Id.* This court may not issue a writ of mandamus in the absence of a finding that the commission abused its discretion. *State ex rel. V & A Risk Servs. v. Ohio Bur. of Workers' Comp.,* 10th Dist. No. 11AP-742, 2012-Ohio-3583, ¶ 18 ("Mandamus will not lie to substitute a court's discretion for that of an administrative official unless the administrative official's refusal to perform the act constitutes an abuse of discretion.").

{¶ 17} In order to establish a VSSR, an employee must prove that: (1) there exists an applicable and specific safety requirement in effect at the time of the injury; (2) the employer failed to comply with the requirements; and (3) the failure to comply was the cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972).

{¶ 18} The determinative question in this case is, thus, whether the commission's interpretation and application of the two safety regulations at issue gives rise to a patently illogical result. Stated differently, the issue in this mandamus action is whether the commission abused its discretion in finding that the lack of a safety latch on the hook to which the magnet was attached constituted a violation of either, or both, commission rules upon which the claimant based his VSSR claim, i.e., Ohio Adm.Code 4123:1-5-14(G) or 4123:1-5-15(B).

**Objections relative to Ohio Adm. Code 4123:1-5-14**

{¶ 19} Both the claimant and the commission raise in their first objections issues concerning the interpretation and applicability of subsection (G) of Ohio Adm.Code 4123:1-5-14, the power-driven cranes and hoists rule.

*Claimant's Objection 1*

{¶ 20} Claimant's first objection, which we sustain, states:

> Where a relevant term is not defined by the code, its interpretation is exclusively within the authority of the commission. The magistrate erred in finding OAC 4123:1-5-

14(G)'s reference to "defective crane safety devices or load-carrying equipment" is limited to those safety devices or equipment listed in OAC 4123:1-5-14(C)-(F). The terms "equipment" and "load-carrying equipment" are not synonymous and the magistrate cannot substitute his definition in place of the commission's.

{¶ 21} Ohio Adm.Code 4123:1-5-14 is a specific regulation governing power-driven cranes and hoists, including overhead electric traveling cranes (subsection (C)), electric jib cranes (subsection (D)), electric single-rail cranes and hoists (subsection (E)), and electric gantry cranes (subsection (F)). Subsections (C), (D), (E) and (F) each begin by defining each of those types of cranes. Each subsection, under a subheading labeled "Equipment," imposes specific enumerated safety requirements for certain crane components, e.g. brakes, rail stops, cabs, etc.

{¶ 22} In addition, Subsection (G) of Ohio Adm.Code 4123:1-5-14 provides:

(G) Specific requirements applicable to *all paragraphs of this rule:*

(1) Defective safety devices or load-carrying equipment.

Defective crane safety devices or load-carrying equipment shall be repaired or replaced.

(Emphasis added.)

{¶ 23} The SHO noted that the claimant "was operating a power driven crane" at the time of his injury and found that "[Ohio Adm.Code] 4123[:]1-5-14(G)(1), pertaining to power driven cranes and hoists, is applicable to this case." (Aug. 9, 2011 Corrected Order, 2.) The magistrate concluded, to the contrary, that "[i]t is clear that [subsection G's] reference to '[d]efective safety devices or load-carrying equipment' is a reference to the specifically identified devices and equipment found throughout paragraphs (C) through (F)' of the rule" (Magistrate Decision, at ¶ 120).

{¶ 24} Accordingly, as interpreted by the magistrate, subsection (G) requires repair or replacement of defective safety devices or load-carrying equipment only if the defective equipment is specifically identified in paragraphs (C) through (F) of Ohio Adm.Code 4123:1-5-14. A necessary corollary to the magistrate's conclusion is that any crane components not specifically identified in those subsections are not subject to the mandate of subsection (G) that "defective safety devices or load-carrying equipment" be repaired or

replaced. The magistrate concluded that Ohio Adm.Code 4123:1-5-14(G) did not apply to this case because no specific reference to crane hook safety latches appears in paragraphs (C) through (F) of the rule.   The SHO had, however, found that the rule was applicable to this case because claimant was using a power-driven crane at the time of the accident, and the crane had a defective safety device, which caused claimant's injury.

{¶ 25} In his first objection, claimant challenges the magistrate's determination that the word "equipment" in subsection (G)(1) of Ohio Adm.Code 4123:1-5-14 applies only to safety devices or equipment expressly identified in subsections (C) through (F) of Ohio Adm.Code 4123:1-5-14.   That is, claimant contends that the commission acted reasonably in impliedly finding that other types of crane equipment beyond those expressly listed in subsections (C) through (F) of the rule fall within the scope of subsection (G).   Claimant argues that the magistrate may not substitute his definition of an undefined term in a commission rule for that of the commission.  We agree.

{¶ 26} Subsection (G) of the crane rule applies by its own terms to "all paragraphs" of Ohio Adm.Code 4123:1-5-14—not just those parts of the rule falling under subsections captioned "Equipment." The commission, in adopting the SHO's decision, found that the rule did apply to the facts of this case.  It is clear that the SHO considered the wire rope as well as the bottom hook that attached the magnet to the wire rope to be components of the crane.   For example, the SHO found that "the weight of the evidence supports that there was no safety latch *on the crane* at the time of [claimant's] injury." (Emphasis added.)  (Corrected Order,  3.)

{¶ 27} The SHO, thus, interpreted Ohio Adm.Code 4123:1-5-14(G) as imposing an obligation on employers to remove defective safety devices or load-carrying equipment from use if that defective safety device or load-carrying equipment is a component of any power-driven crane or hoist described in the rule. That interpretation is not patently illogical.

{¶ 28} The commission has authority to interpret its rules in the first instance, and we are required to defer to the commission's interpretation of its own rules.  To our knowledge, the commission has not interpreted Ohio Adm.Code 4123:1-5-14(G) as imposing an obligation to repair or replace defective load-carrying equipment only if that equipment is specifically listed as "equipment" in subsections (C) through (F) of that rule. To the contrary, in a case involving allegedly defective load-carrying equipment for

purposes of Ohio Adm.Code 4123:1-5-14(G), an employer had previously repaired a different defective component part of an overhead hoist system, i.e., a sticking roller, but in doing so created a second, independent defect in a nut/bolt assembly. The Supreme Court of Ohio affirmed a VSSR award based on violation of the same VSSR at issue in this case, Ohio Adm.Code 4123:1-5-14(G), in that the employer had failed to repair or replace defective load-carrying equipment. *State ex rel. Internatl. Truck & Engine Corp. v. Indus. Comm.*, 122 Ohio St.3d 428, 2009-Ohio-3502; *id.* at ¶ 13. Neither nut/bolt systems nor rollers are specifically identified as equipment in the rule; however, the court acknowledged that the award of VSSR compensation was within the scope of the commission's discretion.

{¶ 29} The magistrate's interpretation of Ohio Adm.Code 4123:1-5-14(G) is not consistent with *Internatl. Truck & Engine Corp.* Moreover, pursuant to the magistrate's interpretation, and because crane hooks are not specifically identified as equipment in subsections (C), (D), (E), or (F) of the rule, an employer would not be required to repair or replace, for example, a visibly cracked crane hook. In such a case, application of the magistrate's interpretation would produce the illogical result that the employer had no obligation to repair or replace an obviously defective crane hook that clearly posed a risk of serious harm or death to employees working beneath the crane hook simply because "crane hook" is not listed in subsections (C) through (F).

{¶ 30} We therefore reject the magistrate's conclusion of law that the term "safety devices or load-carrying equipment" in subsection (G)(1) included only equipment specifically identified in paragraphs (C) through (F). Rather, in interpreting its own rule, the commission found that the bottom hook was a component of a type of crane described in Ohio Adm.Code 4123:1-5-14 and, as such, fell within the scope of the rule. We have "consistently recognized and generally deferred to the commission's expertise in areas falling under its jurisdiction." *State ex rel. Pennant Moldings, Inc. v. Indus. Comm.* 10th Dist. No. 11AP-942, 2013-Ohio-3259, ¶ 15, and it is appropriate that we do so in this case. The commission did not abuse its discretion in determining that Ohio Adm.Code 4123:1-5-14(G)(1), "pertaining to power driven cranes and hoists [was] applicable to this case." (Corrected Order, 2.)

{¶ 31} We therefore sustain the claimant's first objection and reject the magistrate's conclusion of law that the commission abused its discretion in finding that

Ohio Adm. Code 4123:1-5-14(G)(1) pertaining to power-driven cranes and hoists, applies to this case.

*Commission's Objection 1*

The commission's first objection states:

> The commission's finding that the employer was on notice that the crane's hook safety latch was a "safety device" under the Ohio Adm. Code 4123:1-5-14(G)(1) was supported by some evidence, including the manufacturer's specifications requiring the crane's hook to have a safety latch, and the employer's safety supervisor's testimony that he knew this requirement prior to the worker['s] injury.

{¶ 32} Our finding that the commission did not abuse its discretion in finding that Ohio Adm.Code 4123:1-5-14(G)(1) applies to this case does not, however, resolve the question as to whether the commission abused its discretion in finding that Precision violated the rule.  The SHO concluded that Precision violated Ohio Adm.Code 4123:1-5-14(G)(1) because there was no safety latch on the bottom hook to prevent the magnet from becoming disengaged from the crane, even though the manufacturer's specifications required use of a safety latch.  The SHO determined that the lack of a safety latch on the bottom hook of the crane apparatus warranted the conclusion that the crane was equipped with a defective safety device at the time of the incident.

{¶ 33} Having reviewed the commission's arguments in support of this objection, we construe it as positing that it was within the commission's discretion to determine that Ohio Adm.Code 4123:1-5-14(G)(1) applied to this case because the bottom hook of the crane was equipment for purposes of that rule. The commission's arguments resemble the claimant's, and we sustain the commission's first objection to that extent for the same reasons. But, as discussed below, we overrule the commission's first objection to the extent that the commission defends the SHO's conclusion that the bottom hook was itself a "defective safety device."

{¶ 34} The commission argues that the *absence* of a safety device on the bottom hook is equivalent to the *use of* a "defective crane safety device," in violation of Ohio Adm.Code 4123:1-5-14(G)(1).  Precision argues, in response, that the absence of a safety latch on the bottom hook cannot transform the bottom hook into a "safety device," whether defective or not.  We agree. It is  unreasonable to describe the bottom hook of the crane apparatus as a  defective safety device.   The bottom hook was an attachment

component of the crane—not a safety device. Moreover, failure to use a safety device does not mean that the unused safety device itself is defective.

{¶ 35} In addition, the SHO in its resolution of the issue whether Precision violated the second rule at issue in this case, Ohio Adm.Code 4123:1-5-15(B), specifically found that "there was *no* safety device" in place on the crane.  (Emphasis added.)  (Corrected Order, 4.)  It was unreasonable for the commission to accept an order that, at one point describes the bottom hook as a *defective* safety device and at another point describes the same component as *lacking* a safety device.

{¶ 36} Accordingly, the SHO'*s justification* for finding that Precision violated Ohio Adm.Code 4123:1-5-14(G)(1) was unreasonable, and the commission abused its discretion in accepting the SHO finding that the absence of a safety latch on the bottom hook warranted the conclusion that the bottom hook was a defective safety device.

{¶ 37} Our conclusion that the bottom hook was not a defective safety device does not, however, mandate a finding that Precision complied with Ohio Adm.Code 4123:1-5-14(G)(1).  Rather, we sustain the commission's objection to the extent that it posits that Precision could nevertheless have violated the rule. Subsection (G)(1) requires repair or replacement of "defective load-carrying equipment," as well as repair or replacement of defective safety devices. The term "load-carrying equipment" is not specifically defined in either Ohio Adm.Code 4123:1-5-14(G)(1) or 4123:1-5-01, which is the general definitional rule for purposes of Chapter 4123 of the regulations. "Where a relevant term is left undefined by the safety code, its interpretation rests solely with the commission.  While the commission may rely on an outside definition, it is not required to do so." *State ex rel. Timken Co. v. Hammer*, 95 Ohio St.3d 121, 2002-Ohio-1754, ¶ 36, citing *State ex rel. Go-Jo Industries v. Indus. Comm.*, 83 Ohio St.3d 529 (1998).

{¶ 38} Arguably, Precision violated Ohio Adm.Code 4123:1-5-14(G)(1) even if the bottom hook was not a safety device, if: (1) the crane when configured with the bottom hook was load-carrying equipment for purposes of the rule; (2) the bottom hook was defective for lack of a safety device; and (3) Precision, with prior knowledge of its defective nature, allowed its continued use without repairing or replacing it.  The commission has not determined these issues. If the commission answers these inquiries in the affirmative, then Precision violated Ohio Adm.Code 4123:1-5-14 in failing to repair or replace the bottom hook by ensuring that it was protected by a safety latch.

{¶ 39} We therefore order the commission to determine whether use of the crane without a safety latch on the bottom hook of the crane violated Ohio Adm.Code 4123:1-5-14(G)(1) in that Precision, by allowing the crane to be used without a safety device to preclude the magnet from becoming disengaged from the crane, thereby failed to "repair or replace defective load-carrying equipment" of a type of crane described in the rule. The commission's first objection is sustained in part and overruled in part.

### Objections Relative to Ohio Adm.Code 4123:1-5-15

{¶ 40} All three parties have raised objections to the magistrate's decision relative to Ohio Adm.Code 4123:1-5-15, which provides rules for hoisting and haulage equipment. That rule provides, in relevant part:

> (A) Equipment such as slings, hoisting or haulage lines, wire rope, natural or synthetic fiber rope, chain, metal mesh and synthetic web, and attachments used to handle material or equipment shall be used in accordance with the manufacturer's recommendations.
>
> (B) Equipment shall be removed from service when there is evidence of a defect, damage, or distortion which may weaken such equipment.

{¶ 41} We begin by addressing the second objections of both the claimant and the commission, both of which challenge the magistrate's conclusions concerning interpretation of the word "equipment" in Ohio Adm. Code 4123:1-5-15(B).

{¶ 42} Claimant's second objection states:

> The magistrate erred in finding that the commission failed to determine that a hook which is missing its safety latch is "equipment" as used in [Ohio Adm.Code] 4123:1-5-15.

The commission's second objection is similar. It states:

> Where Ohio Adm.Code 4123:1-5-15 required: "equipment shall be removed from service when there is evidence of a defect" and there was some evidence to support the SHO's interpretation that the crane with hook was the: "equipment" referred to in the regulation, the magistrate erred in requiring the commission to reconsider whether the hook safety latch alone was the "equipment" described in the regulation.

{¶ 43} In finding that Precision violated Ohio Adm.Code 4123:1-5-15(B), the SHO necessarily determined that the bottom hook was equipment within the scope of

subsection (B) of the rule requiring removal from service of defective, damaged or distorted "equipment." In their second objections, the claimant and the commission challenge the magistrate's determinations that (1) "equipment" for purposes of subsection (B) of Ohio Adm.Code 4123:1-5-15, is necessarily equivalent to "equipment" as identified in subsection (A) (Magistrate's Decision, ¶ 124), and (2) the commission must therefore reconsider claimant's assertion that Precision violated subsection (B) of Ohio Adm.Code 4123:1-5-15. We sustain their objections and reject the magistrate's recommendation that we order the commission to reconsider whether the bottom hook was "equipment" as contemplated in subsection (A) of Ohio Adm.Code 4123:1-5-15.

{¶ 44} In this case, the SHO concluded, albeit without express discussion, that the bottom hook was equipment within the scope of subsection (B). This conclusion is revealed by the SHO's statements "the lack of a safety latch amounted to a defect which weakened *the equipment,*" and "the crane should have been removed from service and not in use, as required by Ohio Adm.Code 4123:1-5-15(B) pertaining to Hoisting and Haulage Equipment." (Emphasis added.) (Corrected Order, 3.) The commission thus interpreted its rule to include the bottom hook of the crane as hoisting and hauling equipment within the scope of subsection (B). As discussed above relative to Ohio Adm.Code 4123:1-5-14(G)(1), the commission has the discretion to interpret its own rules. We find its interpretation to be reasonable and, therefore, do not disturb it.

{¶ 45} We find that the commission was not required to interpret the word "equipment" in subsection (B) of the rule as necessarily being equivalent to the word "equipment" in subsection (A) of the rule. The commission found that the rule applied if the component at issue may reasonably be deemed to be hoisting and haulage equipment. "Equipment" is a common word, the meaning of which may easily be determined. The rule does not provide that the subsection (A) "definition" applies to all other paragraphs of Ohio Adm.Code 4123:1-5-15, and we will not read such a provision into the rule.

{¶ 46} We therefore sustain the second objections of both the claimant and the commission.

*Precision's first objection*

{¶ 47} Precision's first objection states that the magistrate erred in his findings concerning Ohio Adm.Code 4123:1-5-15. More specifically, Precision contends that:

> A. Ohio [Adm.]Code 4123:1-5-15 does not specifically require a safety latch.

B. "Equipment" under Ohio [Adm.]Code 4123:1-5-15(A) does not define "Equipment" under (B).

C. Even if Ohio [Adm.]Code 4123:1-5-15(B) is read in conjunction with section (A), neither section specifically requires a safety latch, nor specifically defines a safety latch to be "equipment" as used in the rules.

D. Even if Ohio [Adm.]Code 4123:1-5-15(A)'s definition of "equipment" applies to (B), there is no "evidence of a defect, damage, or distortion which may weaken such equipment."

{¶ 48} We acknowledge that Ohio Adm.Code 4123:1-5-15 does not include a specific reference to safety latches, nor does it specifically require a safety latch on crane hooks, nor does it specifically define a safety latch as equipment. Precision's statements in parts (A) and (C ) of its first objection are therefore true. Additionally, in resolving the claimant's and commission's second objections, we have determined that the word "equipment" in Ohio Adm.Code 4123:1-5-15(B) is not limited to equipment as defined in Ohio Adm.Code 4123:1-5-15(A). Accordingly, we accept as true Precision's statement in part (B) of its first objection. Our acknowledgment of the validity of Precision's statements in parts (A), (B), and (C) does not, however, necessarily compel the conclusion that Precision did not violate Ohio Adm.Code 4123:1-5-15, as Precision suggests.

{¶ 49} In its argument relative to part (C) of its first objection, Precision contends that Ohio Adm.Code 4123:1-5-15(B) is a general safety rule as opposed to a specific safety requirement. In fact, Precision has consistently argued from the earliest stages of these proceedings that neither Ohio Adm.Code 4123:1-5-14(G)(1) nor 4123:1-5-15(B) plainly apprised it of any *specific* obligation it had to its employees and that the two rules therefore do not constitute *specific* safety requirements. It contends that, to be a specific safety requirement, the rules must have specifically required the use of a safety latch with every crane hook.

{¶ 50} It has long been recognized in Ohio that "[t]he term, 'specific requirement,' as used in Section 35, Article II of the Constitution of Ohio, does not comprehend a general course of conduct or general duties or obligations flowing from the relation of employer and employee, but embraces such lawful, specific and definite requirements or standards of conduct as are prescribed by statute or by orders of the Industrial Commission, and which are of a character plainly to apprise an employer of his legal

obligations toward his employees." *State ex rel. Holdosh v. Indus. Comm.*, 149 Ohio St. 179 (1948), syllabus. Accordingly, a specific safety requirement must plainly apprise employers of their legal obligations.

{¶ 51} Courts have on numerous occasions considered the question of whether a rule adopted by the commission imposes a specific safety requirement or, alternatively, a general requirement that imposes a "general course of conduct" or "general duties or obligations flowing from the relationship of employer and employee." In 1964, for example, the Supreme Court of Ohio considered a rule that provided as follows:

> Whenever practicable, the platform of swing scaffold shall be so lashed or secured while in use that they cannot sway from the structure.

*State ex rel. Fast & Co. v. Indus. Comm.*, 176 Ohio St. 199, 200 (1964).

{¶ 52} The Supreme Court held that the rule was specific because the employer was left with no discretion in terms of what it should do in regard to the use of a particular piece of equipment, i.e., it required a "specific thing to be done in relation to the use of [a] scaffold." *Id.* at 201. Even though the rule included the phrase "when practicable," the court observed that the word "practicable" has a definite meaning, and that the rule imposed a definite obligation on the part of the employer. It noted that "the fact that the method of securance is not delineated by the rule [does not] render the rule general," in that both the requirement and the result to be accomplished are specific, and recognized that "[d]ue to the varying situations encountered in this type of work it would not be feasible to delineate specific methods." *Id.*

{¶ 53} Similarly, in this case, an employer who causes employees to use hoisting and haulage equipment is specifically notified by Ohio Adm.Code 4123:1-5-15(B) that it must repair or replace hoisting and haulage equipment if the equipment is defective. Both the situation and the obligation are specifically identified. The fact that the particular component that becomes defective is not specifically identified does not change the rule into a general one. As in *Fast & Co.,* it would not be feasible for the commission to delineate each and every component of hoisting and haulage equipment that is covered by the "repair or replace" requirement. Nor does the fact that a more specific rule could have, in hindsight, been drafted mean that the existing rule is not specific.

{¶ 54} By adopting the SHO's order granting the VSSR award, the commission impliedly determined that Ohio Adm.Code 4123:1-5-15(B) is a specific safety requirement.

Given the precedent we have outlined above, we cannot say the commission erred in so doing.

*Sufficiency of the Evidence*

{¶ 55} In section (D) of Precision's first objection, Precision challenges the SHO's conclusion as to the existence of a "defect, damage, or distortion which may *weaken*" the hoisting equipment here at issue. (Emphasis added.) We reject Precision's argument that a violation of Ohio Adm.Code 4123:1-5-15(B) could be proven in this case only if the bottom hook itself had become physically weakened by, for example, being bent, broken or frayed. Webster's Encyclopedic Unabridged Dictionary of the English Language (Portland House 1996), includes as synonyms for the word "weaken" the words "diminish" and "impair." It was within the commission's discretion to find that the lack of a safety latch impaired the safe functioning and reliability of the crane hook, thereby diminishing its effectiveness, i.e., "weakening" it. We further observe that "[b]ecause the rule of strict construction concerns only the applicability of the specific safety requirement to the employer, it does not permit a reviewing court 'to construe the *evidence* of a VSSR strictly in the employer's favor.' " (Emphasis sic.) *State ex rel. Pennant Moldings, Inc. v. Indus. Comm.*, 10th Dist. No. 11AP-942, 2013-Ohio-3259, ¶ 16, quoting *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134 (2002), ¶ 70.

{¶ 56} We therefore overrule Precision's first objection.

*Precision's Due Process Objection*

{¶ 57} Precision's second objection asserts as follows:

> The Magistrate Erred in Not Ruling Upon Precision's Argument that the Commission Violated Precision's due process of law under the 14th Amendment to the U.S. Constitution and Art. I, §16 of the Ohio Constitution.

{¶ 58} The commission imposed a 50-percent award for violation of the two rules at issue, noting that "[t]he additional award of compensation is granted to the Injured Worker in the amount of percent of maximum weekly rate under the rule of *State ex. rel. Engle v. Indus. Comm.* (1944), 142 Ohio St. 425." (Corrected Order, 4.) Precision acknowledges that the Supreme Court of Ohio has found that the Ohio Constitution does not require the commission to explain or justify its determination of the amount of a VSSR if the award is within the 14-50 percent range. But, Precision contends that the commission deprived it of due process because it lacked an opportunity to prepare a

defense to the issue of the percentage size of a VSSR penalty. It additionally argues that the absence of a more detailed explanation of how the commission arrived at the 50-percent penalty precludes meaningful analysis of whether the commission abused its discretion in setting the amount of the VSSR award.

{¶ 59} We note that the Supreme Court of Ohio in 1997 specifically considered, and rejected, a similar argument that the commission must consider and explain the impact of factors such as the severity of the injury, the egregiousness of the violation, and the inherent dangerousness of involved machinery, just as the commission must consider and explain nonmedical factors in permanent disability cases. *State ex rel. St. Marys Foundry Co. v. Indus. Comm.*, 78 Ohio St.3d 521 (1997). Rather, the court held that "the commission need not explain how it calculated the amount of the VSSR award." *Id.* at 523, citing *State ex rel. Jeep Corp. v. Indus. Comm.,* 42 Ohio St.3d 83, 85-86 (1989), and *State ex rel. Smith v. Huguelet*, 57 Ohio St.3d 1, 2 (1991). In addition, the commission has "considerable discretion" in setting the amount of a VSSR award and abuses that discretion only by assessing an award outside the constitutional 15- to 50-percent range. *State ex rel. Kenton Structural & Ornamental Iron Works, Inc. v. Indus. Comm.*, 91 Ohio St.3d 411, 417 (2001), quoting *St. Marys Foundry Co.* at 524.

{¶ 60} In any event, we have concluded that the commission's order must be vacated based on its faulty reasoning relative to the first rule at issue, Ohio Adm.Code 4123:1-5-14(G)(1). We refuse to predict whether the commission will ultimately again find a violation of that rule. Furthermore, the commission has the authority to change the amount of claimant's award in its new order. Nor will we predict the degree to which the commission will provide in its new order a written explanation supporting the amount of its award. It would, therefore, be premature for us to rule on Precision's due process arguments at this point in time.

{¶ 61} We therefore overrule Precision's second objection.

**IV. Conclusion**

{¶ 62} For the reasons discussed above, the commission's objections are sustained in part and overruled in part, the claimant's objections are sustained, and Precision's objections are overruled. We therefore grant a limited writ of mandamus ordering the commission to vacate its August 9, 2011 corrected order (with the exception of that

portion of the order that vacates the SHO's order mailed August 3, 2011), and to enter a new order consistent with this decision that adjudicates claimant's VSSR application.

*Commission's objections sustained in part and overruled in part; claimant's objections sustained; Precision's objections overruled; limited writ of mandamus granted.*

KLATT, P.J., and CONNOR, J., concur.

_____

# APPENDIX

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Precision Steel Services, Inc., | : | |
| | : | |
| Relator, | | |
| | : | |
| v. | | No. 11AP-1083 |
| | : | |
| The Industrial Commission of Ohio and Melvin E. Meyers, | | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

### M A G I S T R A T E ' S   D E C I S I O N

### Rendered on November 27, 2012

*Willacy, LoPresti & Marcovy, Salvatore J. LoPresti, Timothy A. Marcovy,* and *Michael S. Lewis,* for relator.

*Michael DeWine*, Attorney General, and *John R. Smart*, for respondent Industrial Commission of Ohio.

*Vanderhorst & Burgy LLC, Michael A. Vanderhorst,* and *Kristin L. Burgy*, for respondent Melvin E. Meyers.

### IN MANDAMUS

{¶ 63} In this original action, relator, Precision Steel Services, Inc. ("relator" or "Precision Steel"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Melvin E. Meyers ("claimant") for an additional award for violation of a specific safety requirement ("VSSR") and to enter an order denying the application.

Findings of Fact:

{¶ 64} 1. On March 1, 2008, claimant sustained a crush injury to his left hand while employed as a "burner-fabricator" at a factory operated by relator. On the date of injury, claimant was using an overhead crane with an attached magnet to move a metal part that he was welding. There was evidence showing that as he was maneuvering the part into position on the welding table, the lifting eye of the magnet slipped off the hook on the bottom of the wire rope causing the magnet and metal part to fall on his left hand. There were two hooks involved in the rigging of the magnet to the overhead crane. There was evidence that the lower hook on the bottom of the wire rope did not have a safety latch at the time of the injury.

{¶ 65} 2. The industrial claim (No. 08-315503) is allowed for:

> Amputation of left hand, below elbow; crushing injury of left hand; open wound of left hand, with complications; open wound of left second, third, fourth and fifth fingers, with complications; multiple open fractures of left hand; brief depressive reaction; generalized anxiety disorder; panic attacks; depressive disorder with elements of post traumatic stress disorder.

{¶ 66} 3. On February 12, 2010, claimant filed an application for a VSSR award.

{¶ 67} 4. The VSSR application prompted an investigation by the Safety Violations Investigative Unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau").

{¶ 68} 5. On June 14, 2010, the SVIU investigator visited the site of the accident at the facility operated by Precision Steel. The investigator met with Plant Operations Manager, Jordan Demchyna. He also photographed the overhead crane, welding table, electric magnet and other items related to the accident.

{¶ 69} 6. On August 10, 2010, the SVIU investigator met with claimant and obtained his affidavit. Claimant's affidavit executed August 10, 2010 avers:

> [Two] I began my employment with Precision Steel Services, Inc[.] in July 26, 2001[.] I was hired to perform the job of burner/fabricator and I held this position at the time of my injury[.] My job duties involved operating the burn table and fabricating parts[.] I was in the process of welding a part at the time of my injury.
>
> [Three] I arrived for overtime day-shift work on March 1, 2008 and reported to my regular work area[.] I reviewed my work orders and began fabricating a part on the welding

table[.] I was using an overhead 10-ton crane with attached electric magnet to lift the pieces in place[.] I had been working on fabricating the part between three to five hours at the time of my injury[.]

[Four] I was in the process of turning over the part so I could perform additional welding activities when the incident occurred[.] I had the pendent control for the crane in my right hand and my left hand was resting on the weld table as I was using the electric magnet to turn the part[.] As I was maneuvering the part into position the lifting eye of the magnet slipped off the hook on the bottom of the wire rope causing the metal part and magnet to fall on top of my hand[.] My hand was crushed and remained trapped under the metal part[.] It took approximately five coworkers to lift the metal part off of my hand[.] An ambulance was called and I was transported to St[.] Vincent's Hospital for medical treatment[.]

[Five] My injury occurred because the hook on the bottom of the wire rope did not have a safety latch to keep the magnet from coming off of it[.]

[Six] I viewed the photographs that Investigator Freeman has in his possession[.] The crane, magnet, and welding table accurately depict my work area and the tools I was using at the time of my injury[.] The cable the magnet is attached to has been changed[.] The bottom hook on the cable was removed and replaced with a clevis attachment[.]

{¶ 70} 7. The SVIU investigator obtained company documents relating to the accident. One of the documents is a two-page form captioned "Occupational Injury/Illness Investigative Report." This form was completed by hand by Tony Sumner on the date of injury.

{¶ 71} In response to the pre-printed query "Describe accident in detail," Sumner wrote:

He was using a 10 ton magnet to put part on its back. The magnet slipped off the hook [and] the part fell 2-3 [feet] onto his hand pinching it between the part [and] weld table[.]

{¶ 72} Under the caption "Cause and Prevention Action," the form asks if "[r]epair or modification [is] needed." In response, Sumner wrote: "Safety latch needed." Sumner also indicated that the repair had been completed.

{¶ 73} 8. The SVIU investigator also obtained a company document captioned "Accident/Injury Report."  This document containing pre-printed queries was completed on the date of injury by claimant's supervisor, Albert Morales.  The company form instructs "[e]xplain how accident/injury occurred in detail."  In response, Morales wrote in his own hand:

> Mel was using 10 ton magnet to lay part on it's back, the magnet [slipped] off hook (no safety pin) part fell about 2 to 3 feet on to his hand pinching his hand between part and weld table!

{¶ 74} 9. The SVIU investigator also obtained the handwritten statement of Larry Eckenrode, stating:

> [W]e all picked the plate off of Mel['s] hand[.]   He was flipping the plate before that when the magnet came off the hook and that's how his hand got smash[ed][.]

{¶ 75}   10. On September 8, 2010, the SVIU investigator issued his report of investigation.  Under "Discussion," the report states:

> [Three] Investigator Freeman observed and photographed the Burn Bay of Precision Steel Services, Inc[.] where the incident of record occurred[.] Investigator Freeman also observed and photographed the involved Kone XLD 10-ton double box girder top running crane, welding table, and 8,000 lb. electric magnet[.] The employer stated Injured Worker Melvin E[.] M[e]yers was in the process of fabricating a metal part, approximately twenty inches by forty-five inches, on the welding table at the time of the incident[.] The employer continued Mr[.] M[e]yers was using the electric magnet attached to the overhead crane to turn the part over when the magnet slipped off the hook and the magnet and part fell onto his hand[.] The employer further stated Mr[.] M[e]yers should have used a lifting clamp or nylon sling to turn the part over instead of using the electric magnet[.] The employer indicated the part weighed approximately 1,200 lbs[.]   The employer further stated the 1 1/4" ribs on the metal part struck Mr[.] M[e]yers' hand[.]
>
> [Four] The employers stated the safety latch attaching the magnet to the metal hook was missing at the time of the incident of record[.] The employer further stated a safety latch was installed on the metal hook after the incident[.]
>
> * * *

[Nine] Injured Worker Melvin E[.] M[e]yers had an opportunity to view the photographs obtained by Investigator Freeman at the time of the on-site investigation[.] Mr. M[e]yers stated the crane, magnet, and welding table accurately depict his work area and the tools he was using at the time of his injury[.] He further stated the cable the magnet is attached to has been changed[.] Melvin E[.] M[e]yers indicated the bottom hook on the cable was removed and replaced with a clevis attachment[.]

{¶ 76} 11. The SVIU investigator also obtained Occupational Safety and Health Administration ("OSHA") form 301 completed by Precision Steel on March 3, 2008. In response to the pre-printed query "[w]hat happened," Precision Steel wrote:

Magnet slipped off hook [and] part fell 2 to 3 [feet] onto his hand, pinching his hand between the part [and] the weld table.

{¶ 77} 12. In June 2011, relator obtained affidavits from six of its employees. Affidavits were obtained from Jordan Demchyna, Larry Eckenrode, Anthony Johnson, Leonard Gamble, Dana Burchell, and Anthony Smith.

{¶ 78} 13. The affidavit of Demchyna executed June 9, 2011 avers:

[Two] In March of 2008, my position was that of Operation's Manager.

[Three] I did not work on March 8, 2008, but was advised of the accident shortly after it occurred. I did not know the extent of Meyers' injuries.

[Four] I conducted an investigation the following morning. I spoke with Tony Sumner who had completed an incident report.

[Five] Upon entering the Burn Bay, I checked out crane #4, the 10-ton crane used by Melvin Meyers at the time of the accident. I noted the safety clasp on the crane's hook was missing.

[Six] A search was conducted, but the safety clasp was never found. At no time prior to this accident did anyone report that the safety clasp on the #4 crane was missing or defective in any manner.

{¶ 79} 14. The affidavit of Eckenrode executed June 9, 2011 avers:

[One] I have been employed at Precision Steel since Feb. 15, 2008. In March of 2008, my position was that of laborer/crane operator.

[Two] The day Melvin Meyers was injured; I was operating the 20-ton crane in the Burn Bay.

[Three] I heard a large "boom" and looked over at Melvin Meyers. His hand was trapped under a piece of steel that had fallen from the crane. Jimmy Vance, Mike Van Dusen and I lifted the steel off of Meyers' hand. We then called 911.

[Four] After Melvin left, I inspected the work area. I recall the electro-magnet was on it's [sic] side and the rope cable was still attached to the electro-magnet.

[Five] I specifically recall that the rope cable was not attached to the crane when we were moving the steel from Meyers' hand. Had the rope cable been attached to the crane, it would have interfered with our lifting the fallen piece of steel.

[Six] The description contained in SVIU Exhibit 15 (attached hereto) is incorrect. The "little hook" was <u>not</u> missing the safety clip. The hook with safety clip was intact and attached to the electro-magnet.

[Seven] In my capacity as laborer/crane operator, I used the #4 10-ton crane on a daily basis. I used it before and after the Meyers accident. At no time prior to the accident of March 8, 2008, did I ever notice any defect in the crane or the hook attached to the crane. The safety clasp was always present.

(Emphasis sic.)

{¶ 80} 15. The affidavit of Johnson executed June 9, 2011 avers:

My particular job required me to use the #4 10-ton crane. I used it practically every day. In particular I would use the 10-ton crane to "<u>put parts on a skid or pull parts from burning table and then put on skids.</u>"

When using any crane in the burn bay, I never noticed any defective parts and specifically, I do not recall any defective hooks. Any crane hook I used had a safety clasp on the hook. If I had noticed a hook without a safety clasp, <u>I would have "told maintenance."</u>

(Emphasis sic.)

{¶ 81} 16.  The affidavit of Leonard Gamble executed June 9, 2011 avers:

> My particular job required me to use the #4 10-ton crane. I used it practically every day. In particular I would use the 10-ton crane to "loan [sic] material on the tables; to unload the material from the burn tables and to place the finished material on the pallet."
>
> When using any crane in the burn bay, I never noticed any defective parts and specifically, I do not recall any defective hooks. Any crane hook I used had a safety clasp on the hook. If I had noticed a hook without a safety clasp, I would have "shut the power off, put a lock-out tag on it and then notified my supervisor."

(Emphasis sic.)

{¶ 82} 17.  The affidavit of Burchell executed June 9, 2011 avers:

> My particular job required me to use the #4 10-ton crane. I used it practically every day. In particular I would use the 10-ton crane to "pull parts from the burn table to be cleaned and I would also use it to carry scrap to a scrap pile."
>
> When using any crane in the burn bay, I never noticed any defective parts and specifically, I do not recall any defective hooks. Any crane hook I used had a safety clasp on the hook. If I had noticed a hook without a safety clasp, I would have "notified maintenance."

(Emphasis sic.)

{¶ 83} 18.  The affidavit of Smith executed June 10, 2011 avers:

> My particular job required me to use the #4 10-ton crane. I used it practically every day. In particular I would use the 10-ton crane to "pull parts out of the plate and put the parts on the skid. Sometimes I use it to move scrap from the ground to the hopper."
>
> When using any crane in the burn bay, I never noticed any defective parts and specifically, I do not recall any defective hooks. Any crane hook I used had a safety clasp on the hook. If I had noticed a hook without a safety clasp, I would have "I would tell my supervisor and if the supervisor didn't do anything before I need to use it again, I would get maintenance."

(Emphasis sic.)

{¶ 84} 19. On June 15, 2011, the VSSR application was heard by Staff Hearing Officer ("SHO") Mara Lanzinger Spidel. The hearing was recorded and transcribed for the record.

{¶ 85} 20. At the hearing, Demchyna testified. On cross-examination by claimant's counsel, the following exchange occurred:

> MR. VANDERHORST: You would agree, wouldn't you, that a safety hook, latch, is recommended for any time you're lifting a load with a hook?
>
> MR. DEMCHYNA: Yes, sir.
>
> MR. VANDERHORST: Okay. And in particular, hooking up to an electro magnet you want a safety hook latch?
>
> MR. DEMCHYNA: Hooking up anything, yes.
>
> MR. VANDERHORST: And a, purpose of that safety latch is just to keep a load from coming off the hook, if the hook should twist a certain, far enough direction?
>
> MR. DEMCHYNA: Yes, sir.
>
> MR. VANDERHORST: Okay. In fact, the manufacturer's recommendations indicate that you should always use a hook with a safety latch when you're connecting it to the magnet, correct?
>
> MR. DEMCHYNA: Yes, sir.
>
> MR. VANDERHORST: Okay. And you were aware of that back at the time of Melvin's injury, there should be safety latches?
>
> The Court Reporter: Yes?
>
> MR. DEMCHYNA: Yes, sir, sorry.
>
> * * *
>
> MR. MARGELEFSKY: Okay. In your capacity as operations manager how often did you inspect the cranes or the equipment, such as the cables and the hooks?
>
> MR. DEMCHYNA: Personally, I do not.
>
> MR. MARGELEFSKY: Okay.

MR. DEMCHYNA: That's annual OSHA inspections done by an outside source.

MR. MARGELEFSKY: Okay. If someone has a problem with the crane, the hook, the cables, who do they talk to as far as repairs?

MR. DEMCHYNA: Maintenance.

MR. MARGELEFSKY: Okay. Are you aware of anybody calling to your attention or to maintenance, I assure maintenance reports to you?

MR. DEMCHYNA: Yes, sir.

MR. MARGELEFSKY: Okay. Any problems with the hooks on the crane or on the rope cables demonstrated in the video?

MR. DEMCHYNA: No, sir.

* * *

MR. VANDERHORST: And you indicated an annual inspection of the cranes?

MR. DEMCHYNA: Yes.

MR. VANDERHORST: What about between those annual inspections?

MR. DEMCHYNA: Daily visual inspections, nothing documented, no record inspection.

MR. VANDERHORST: Nothing documented?

MR. DEMCHYNA: No.

MR. VANDERHORST: No pieces of paper that would document it?

MR. DEMCHYNA: No.

HEARING OFFICER SPIDEL: I'm gonna interrupt you, Mr. Vanderhorst, I just want to make sure, because earlier when you were testifying I thought you said you did not inspect the cranes; is that correct?

MR. DEMCHYNA: Correct.

HEARING OFFICER SPIDEL: Okay. Just making sure I heard correctly, thank you.

MR. DEMCHYNA: Yes, ma'am.

MR. MARGELEFSKY: I don't believe he's saying he inspected it. You said there's daily inspections but that would be by whom?

MR. DEMCHYNA: Operators.

MR. MARGELEFSKY: Operators.

(Tr. 49-50, 56, 63-64.)

{¶ 86} 21. At the hearing, Mr. Eckenrode testified on direct examination by relator's counsel:

MR. MARGELEFSKY: Would you tell Ms. Spidel what you remember from that day?

MR. ECKENRODE: I was standing at the other side of the building and obviously heard a loud boom so when I heard that I looked down, looked like he was trapped so ran down there. Two burners also seen at the same time and we lifted the weldment off of his hand and pulled it out and then he went and sat down and then that's when we called 911.

MR. MARGELEFSKY: So you and two other people?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Okay. Do you remember whether the magnet was still attached to the weldment?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Do you remember whether or not the cable was still attached to the magnet?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Do you recall whether the cable was attached to the crane?

MR. ECKENRODE: No.

MR. MARGELEFSKY: No, you don't remember, or no, it was not?

MR. ECKENRODE: Oh, it was not.

MR. MARGELEFSKY: Okay.

MR. ECKENRODE: Attached to the -

MR. MARGELEFSKY: And then how do you remember that? Why do you remember that?

MR. ECKENRODE: Because when we were lifting the weldment off of him we noticed it because the cable was a stiff cable and it would have stopped us from proceeding lifting the weldment, and that's how I know it was dangling on the side.

MR. MARGELEFSKY: Okay. Again, in your capacity at the time working in the burn bay you indicated that you used crane number 4?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: How often would you use crane number 4?

MR. ECKENRODE: All the time.

MR. MARGELEFSKY: All right. The rope cable that was attached to crane, crane number 4 on the day of the accident, was that the same rope cable that was on that crane regularly?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Okay. The hook that was at the bottom of that cable, was that hook on there regularly?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Okay. And so when you used it you would know whether or not there was a safety latch on that hook, correct?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Okay. Do you recall a time when that lower hook did not have a safety latch?

MR. ECKENRODE: Not from what I recall.

MR. MARGELEFSKY: Do you recall ever having to call maintenance and tell them that there was a problem with that hook?

MR. ECKENRODE: No.

MR. MARGELEFSKY: Okay. So we've established two things, number one, when you lifted the weldment off of Mr. M[e]yers the electro magnet was connected to the cable with the hook that attached the cable to the rope?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Okay. So in - to the best of your recollection there's no way the magnet slipped off that lower hook?

MR. ECKENRODE: No.

MR. MARGELEFSKY: Okay. Cable was still attached?

MR. ECKENRODE: Yes.

MR. MARGELEFSKY: Okay. And the, the cable was not attached to the crane?

MR. ECKENRODE: No.

(Tr. 79-83.)

{¶ 87} 22. Following the June 15, 2011 hearing, an order was mailed on August 3, 2011. That order indicates that it was electronically signed by SHO Spidel.

{¶ 88} 23. On August 9, 2011, a corrected order was mailed. The corrected order indicates that it was electronically signed by Spidel.

{¶ 89} 24. The corrected order states:

Pursuant to the continuing jurisdiction provision of R.C. 4123.52, the Staff Hearing Officer's order, mailed August 3, 2011, is <u>VACATED</u> and the following order is put in its place:

* * *

It is the order of the Staff Hearing Officer that the Injured Worker was employed on the date of injury, 03/01/2008, by the Employer as a Burner/Fabricator and sustained an injury in the course of and arising out of employment when he was utilizing an overhead crane, with an attached electric magnet to move a piece of steel, when the magnet slipped off the hook and the magnet and piece of steel fell onto his hand.

It is further the finding of the Staff Hearing Officer that the Injured Worker's injury was due to the Employer's failure to comply with R.C. Sections 4123:1-5-14 (G) (1) and 4123:1-5-15(B).

The Injured Worker dismissed the request to consider R.C. Section 4123:1-5-15(D). Therefore, no finding is made on that Code Section.

The Injured Worker was injured on 03/01/2008 when he was using a crane while in the process of welding a part. He was fabricating a part on the welding table, using an overhead 10-ton crane with attached electric magnet to lift the pieces into place. He had been working on fabricating the part between 3 to 5 hours at the time of his injury. He was in the process of turning over the part so he could perform additional welding activities when the incident occurred. He used the pendant control for the crane in his right hand and his left hand was resting on the weld table as he was using the electric magnet to turn the part. As he was maneuvering the part into position, the lifting eye of the magnet slipped off the hook on the bottom of the wire rope, causing the metal part and magnet to fall on top of his hand. His hand was crushed and remained trapped under the metal part. It took approximately five co-workers to lift the metal part off of his hand. An ambulance as called and he was transported to St. Vincent's Hospital for medical treatment.

The Injured Worker has cited the following Code Sections pertaining to the power driven crane he was operating, Code Section R.C. 4123:1-5-14 and 4123:1-5-15.

The Hearing Officer finds that [R.C.] 4123[:]1-5-14 (G) (1), pertaining to power driven cranes and hoists, is applicable to this case.

Injured Worker was operating a power driven crane, identified in the Investigation Report of 09/08/2010, as a Kone XLD 10-ton double box girder top running crane with

8,000 pound electric magnet at the time he was injured. (Investigative Report paragraph 3; SVIU Exh. 9).

The Code Section states:

> Section (G) Specific requirements applicable to all paragraphs of this rule, (1) Defective safety devices or load carrying equipment.
>
> Defective crane safety devices or load carrying equipment shall be repaired or replaced.

The Hearing Officer finds the preponderance of the evidence shows that the crane causing Injured Worker's injury had a defective safety device. The defect was that the safety latch was not present on the crane hook. The facts supporting this conclusion are as follows:

(1) The Employer told the safety investigator that the safety latch attaching the magnet to the metal hook was missing at the time of the incident of record. (SVIU Report, paragraph 4).

(2) The Injured Worker told the investigator that the hook on the bottom of the wire rope did not have a safety latch to keep the magnet from coming off of it. (SVIU Report, paragraph 8).

(3) The Employer's Occupational Injury/Illness Investigative Report completed on the date of injury by Tony Sumner answers the question: "repair or modification needed" with: "safety latch needed." (SVIU Exh. 5).

(4) Mr. Eckenrode, another crane operator at the time Injured Worker was injured, also completed a statement in conjunction with the Employer's investigation of the injury, and indicated, "the magnet came off the hook." (SVIU Exh. 5).

(5) The Accident/Injury Report completed by Supervisor, Albert Morales, on 03/01/2008, the date of injury, indicated, "magnet slipped off the hook, no safety pin." (SVIU Exh. 5).

(6) The OSHA 301 form noted "magnet slipped off the hook and part fell." (SVIU Exh. 15).

(7) The testimony was offered at hearing that a search was conducted for the clasp but none was ever found[.] (Transcript, Page 95).

The Hearing Officer finds that the magnet would not have slipped off if a safety hook had been present.

Further, the testimony of the Employer's witnesses do not support that a safety latch was present at any time before or at the time of the industrial injury. The Employer's witnesses testified that they were not aware whether a safety latch was present or not.

Mr. Demchyna, Operations Manager, who was responsible for overseeing safety for the Employer, agreed that a safety latch was recommended for lifting a load with a hook (Transcript Page 49, Lines 7-22). When questioned, "In particular, hooking up to an electromagnet you want a safety hook latch?" He answered, "Hooking up anything, Yes" (Page 49, Lines 12-16)[.] He also agreed that the manufacturer's recommendations indicate that you should always use a hook with a safety latch when you are connecting it to the magnet (Page 49, Lines 23-25 through Page 50, Lines 1-3)[.] He further testified that he knew at the time of the Injured Worker's injury that there should be a safety latch. (Page 50, Lines 4-10)[.] Mr. Demchyna indicated he never personally inspected the crane or the equipment such as cables or hooks. (Page 56, Lines 1-7)[.] Rather, he indicated inspections were made of the hooks by OSHA inspectors, (Page 56, Lines 9-11) and that inspections were done by operators, but that no record was kept of any inspections. (Page 63, Lines 18-25 through Page 64, Lines 1-23)[.] He testified that if there was a problem, someone would talk to maintenance and maintenance would report to him. (Page 56, Lines 12-25)[.]

The Hearing Officer finds Mr. Demchyna's testimony was not persuasive that a safety latch was present, only that he did not personally inspect to see whether one was there or not.

Mr. Eckenrode testified on behalf of the Employer, and was not found to be a credible witness by this Hearing Officer. On the date of injury, he made a statement that the magnet came off the hook causing Injured Worker's injury. In his testimony at hearing, he indicated that the cable was still attached to the magnet. (Page 80, Lines 8-16)[.] When questioned, he responded that "he did not recall" whether

there was a time when there was no safety latch on the hook. (Page 82, Lines 12-16)[.]

The witness statements on behalf of the Employer from Mr. Johnson, Mr. Gamble, and Mrs. Smith are similarly unpersuasive in confirming whether a safety latch was, or was not, ever on the crane. They only indicated that they never noticed the hook without a safety clasp. The Hearing Officer finds the self serving affidavits of these witnesses unpersuasive.

Therefore, the Hearing Officer finds the weight of the evidence supports that there was no safety latch on the crane at the time of Injured Worker's injury. The Hearing Officer finds that the violation of [R.C.] 4123:1-5-14 and 4123:1-5-15 was the cause of Injured Worker's injury.

Specifically, the Hearing Officer finds that the safety latch was missing at the time of Injured Worker's injury and therefore the equipment should have been repaired or replaced according to [R.C.] 4123:1-5-14 (G) (1).

Secondly, the crane should have been removed from service and not in use, as required by R.C. 4123:1-5-15 (B) pertaining to Hoisting and Haulage Equipment which states:

> Equipment shall be removed from service when there is evidence of a defect, damage, or distortion which may weaken such equipment.

The Hearing Officer finds the lack of a safety latch amounted to a defect which weakened the equipment (the magnet came off because a safety latch was missing). If a safety latch were present, the magnet would not have come off and crushed Injured Worker's hand.

Additionally, the testimony of the Employer's witnesses supports that a safety latch was a necessary safety feature for use of the crane and hook.

The Hearing Officer finds that the Employer cannot abdicate responsibility and argue that Injured Worker is negligent for failure to report a lack of a safety latch. The review of evidence submitted by the Employer showed a complete lack of safety protocol. There was no clear reporting protocol for when a safety violation was perceived. Mr. Demchyna specifically indicated any reports of problems with machinery would be given strictly to maintenance. The

testimony of Mr. Eckenrode, now a supervisor, indicated that if there were a problem the problem would be reported to supervisors or maintenance. The Employer specifically stated that there was no written documentation or record of machinery being checked on a regular basis. Therefore, the Hearing Officer is unable to conclude that there was any clear responsibility on anyone's part to identify if a safety latch was missing and there was no clear evidence as to who was to report same. The Code Section requires repair, replacement or removal from service of defective safety devices or load carrying equipment. The Hearing Officer finds this responsibility is strictly the burden of the Employer and the Employer has not shown by a preponderance of the evidence that they met this burden.

The Employer's argument that they had no notice of a "defect" as required by State ex. rel. M.T.D. Products vs. Stebbins (1975), 43 Ohio St.2d 144, is unpersuasive. M.T.D. Products and it's progeny apply to cases where there is an equipment malfunction or when something is not working the way it is supposed to. The Hearing Officer finds the holding of M.T.D. Products is not applicable when a safety feature is not present at all.

The Court in State of Ohio ex rel. Monsanto Company, Relator v. Industrial Commission of Ohio and Gregory J. Stebbins (1975) WL 181678 (Ohio App. 10 Dist) clearly explained that one malfunction of a properly installed and properly working safety device does not violate a specific safety requirement.

In this case, the Hearing Officer finds the weight of the evidence shows there was no safety device in place, no safety latch in place on the crane. MTD Products in [sic] inapplicable because there was not a compliant safety device (i.e. safety latch) present that malfunctioned. The Hearing Officer finds there was none present at all.

Therefore, the Employer's request to find no violation of a specific safety requirement as there was a "one time violation" of a specific safety requirement that they did not have knowledge of, is found not well taken.

Therefore, the Hearing Officer finds that the Employer was in violation of the aforementioned Code Sections and that the violation of the Code Sections was the proximate cause of the Injured Worker's injury. If a safety latch were in place, the magnet would not have fallen on Injured Worker's hand.

> It is therefore ordered that a 50% award is granted for violation of Code Sections [R.C.] 4123:1-5-14 and 4123:1-5-15.
>
> The additional award of compensation is granted to the Injured Worker in the amount of percent of maximum weekly rate under the rate under the rule of <u>State ex. rel. Engle v. Indus Comm.</u> (1944), 142 Ohio St. 425.

(Emphasis sic.)

{¶ 90} 25. On September 2, 2011, relator moved for rehearing pursuant to Ohio Adm.Code 4121-3-20(C). The motion was accompanied by a memorandum in support.

{¶ 91} 26. Relator's memorandum argued that the issuance of the two orders created "confusion and an apparent lack of clarity" that compels a rehearing.

{¶ 92} 27. Claimant, through counsel, filed a written response or "answer" to relator's motion for rehearing. Claimant attached as an exhibit to his "answer" a copy of an e-mail sent by SHO Spidel to relator's counsel on August 17, 2011. The Spidel e-mail states:

> I wrote the vssr order and when I received the first draft back from the typist it needed numerous corrections. I submitted the corrections to our local typist to be completed. Unfortunately, when I was out ill, another hearing officer mistakenly signed my uncorrected version of the order. When I returned, I had the typist finish the corrections I had originally made. We had to do it as a "corrected order" only because the order had gone out already.

{¶ 93} 28. On October 25, 2011, another SHO mailed an order denying a rehearing. The SHO's order explains:

> It is hereby ordered that the Motion for Rehearing filed 09/02/2011 be denied. The Employer has not submitted any new and relevant evidence nor shown that the order mailed 08/09/2011 was based on an obvious mistake of fact or on a clear mistake of law.
>
> Further, the 08/17/2011 e-mails from the Staff Hearing Officer to Michael Margelefsky, an Employer representative, e-mails not attached to the Employer[']s request for a rehearing but provided by the Injured Worker's Counsel, show that the corrected order mailed 08/09/2011 was done under the Industrial Commission[']s continuing jurisdiction pursuant to ORC 4123.52 to correct a clerical error.

{¶ 94} 29. On December 8, 2011, relator, Precision Steel Services, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 95} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

{¶ 96} At the outset, the magistrate finds that the commission had continuing jurisdiction to issue the SHO's corrected order mailed August 9, 2011. The corrected order properly vacated the SHO's order mailed August 3, 2011 that was mistakenly issued.

{¶ 97} A mistake of fact—which includes clerical error—justifies invocation of continuing jurisdiction. *State ex rel. Schirtzinger v. Mihm*, 81 Ohio St.3d 459 (1998). Under the circumstances disclosed through the SHO's order mailed October 25, 2011 that denied relator's motion for rehearing, the commission clearly had continuing jurisdiction to issue the SHO's corrected order. The August 17, 2011 e-mails clearly show the circumstances and propriety of the issuance of the corrected order. *See State ex rel. Ranco North Am. v. Indus. Comm.,* 10th Dist. No. 05AP-290, 2006-Ohio-1474.

{¶ 98} The commission determined that relator had violated two specific safety requirements and, on that basis, imposed a VSSR penalty.

{¶ 99} First, the commission determined that relator had violated Ohio Adm.Code 4123:1-5-14(G)(1) which is a rule applicable to power-driven cranes and hoists. That rule requires that defective safety devices or load-carrying equipment shall be repaired or replaced.

{¶ 100} Second, the commission determined that relator had violated Ohio Adm.Code 4123:1-5-15(B), which is a rule applicable to hoisting and haulage equipment. That rule requires that equipment shall be removed from service when there is evidence of a defect, damage, or distortion which may weaken such equipment.

{¶ 101} It is well-settled that a VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer. *State ex rel. Watson v. Indus. Comm.*, 29 Ohio App.3d 354 (1986); *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989).

{¶ 102} It is also firmly established that the determination of disputed factual situations as well as the interpretation of a specific safety requirement is within the final

jurisdiction of the commission, and subject to correction in mandamus only upon a showing of an abuse of discretion. *State ex rel. Roberts v. Indus. Comm.*, 10 Ohio St.3d 1 (1984); *State ex rel. Allied Wheel Products, Inc. v. Indus. Comm.*, 166 Ohio St. 47 (1956); *State ex rel. Volker v. Indus. Comm.*, 75 Ohio St.3d 466 (1996).

{¶ 103}  Of course, the commission's authority to interpret its own safety rules is not unlimited. Strict construction does require that the commission's interpretation be reasonable. *State ex rel. Martin Painting & Coating Co. v. Indus. Comm.*, 78 Ohio St.3d 333, 342 (1997). The commission may not effectively rewrite its own safety rules when it interprets them. *State ex rel. Lamp v. J.A. Croson Co.*, 75 Ohio St.3d 77, 81 (1996).

{¶ 104}  Paragraph one of the syllabus of *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972) states:

> The term, "specific requirement," as used in Section 35, Article II of the Constitution of Ohio, does not comprehend a general course of conduct or general duties or obligations flowing from the relation of employer and employee, but embraces such lawful, specific and definite requirements or standards of conduct as are prescribed by statute or by orders of the Industrial Commission, and which are of a character plainly to apprise an employer of his legal obligation toward his employees.

*Id.*

{¶ 105}  According to relator, neither of the two safety rules it was found to have violated specifically require a latch on a crane hook.  Citing the above authorities, relator argues that, regardless of the desirability of placing a latch on a crane hook, it did not violate either of the two safety rules and thus, the commission abused its discretion by entering a VSSR award.

{¶ 106}  Relator's contention requires a thorough analysis of the context in which the two rules are found in the code.

{¶ 107}  Analysis begins with the observation that Ohio Adm.Code 4123:1-5 sets forth specific safety rules for workshop and factory safety.

{¶ 108}  Thereunder, Ohio Adm.Code 4123:1-5-14 is captioned "Power-driven cranes and hoists."

{¶ 109}  Thereunder, we find paragraph (C) captioned "Overhead electric traveling cranes," paragraph (D) captioned "Electric jib cranes," paragraph (E) captioned "Electric

single rail cranes and hoists," paragraph (F) captioned "Electric gantry cranes," and paragraph (G) captioned "Specific requirements applicable to all paragraphs of this rule."

{¶ 110} Under paragraph (G) we find the first of the two specific safety rules at issue here. That is, Ohio Adm.Code 4123:1-5-14 provides:

> (G) Specific requirements applicable to all paragraphs of this rule.
>
> (1) Defective safety devices or load-carrying equipment.
>
> Defective crane safety devices or load-carrying equipment shall be repaired or replaced.

{¶ 111} The second specific safety rule at issue here is found at Ohio Adm.Code 4123:1-5-15 captioned "Hoisting and haulage equipment." Thereunder, Ohio Adm.Code 4123:1-5-15(B) provides:

> (B) Equipment shall be removed from service when there is evidence of a defect, damage, or distortion which may weaken such equipment.

{¶ 112} Because Ohio Adm.Code 4123:1-5-15(A) addresses and defines the word "equipment," it is essential that the second rule at issue here be read in light of Ohio Adm.Code 4123:1-5-15(A), which provides:

> Equipment such as slings, hoisting or haulage lines, wire rope, natural or synthetic fiber rope, chain, metal mesh and synthetic web, and attachments used to handle material or equipment shall be used in accordance with the manufacturer's recommendations.

### Ohio Adm.Code 4123:1-5-14(G)(1)

{¶ 113} The commission, through the corrected order of its SHO found a violation of Ohio Adm.Code 4123:1-5-14(G)(1). The commission determined that the crane "had a defective safety device" and that "[t]he defect was that the safety latch was not present on the crane hook." The corrected order further found that "the safety latch was missing" at the time of injury and "therefore the equipment should have been repaired or replaced."

{¶ 114} Here, relator points out that Ohio Adm.Code 4123:1-5-14 fails to specifically identify a hook safety latch as a "safety device" or as "load-carrying equipment" in any of the paragraphs that preceed paragraph (G). (Emphasis added.)

{¶ 115} For example, Ohio Adm.Code 4123:1-5-14(C)(1) is captioned "Equipment" and then provides safety rules for brakes, footwalks, rail stops and bumpers. Clearly, a hook safety latch is not among the equipment addressed under Ohio Adm.Code 4123:1-5-14(C)(1).

{¶ 116} Interestingly, Ohio Adm.Code 4123:1-5-14(C)(3) is captioned "Limiting devices" and then provides that "[a] hoist limiting device shall be provided for each hoist to limit the upward travel."

{¶ 117} Under Ohio Adm.Code 4123:1-5-14(D) captioned "Electric jib cranes," certain "[e]quipment" is identified such as a "[h]olding brake," "[r]ail stops" and a "[h]oist limiting device."

{¶ 118} Ohio Adm.Code 4123:1-5-14(E) captioned "Electric single rail cranes and hoists" also specifies "[e]quipment" and a "[h]oist limiting device."

{¶ 119} Ohio Adm.Code 4123:1-5-14(F) captioned "Electric gantry cranes" specifies "[e]quipment" and an "[a]nchor or rail blocking device" and a "[h]oist limiting device."

{¶ 120} It is clear that Ohio Adm.Code 4123:1-5-14(G)'s reference to "[d]efective safety devices or load-carrying equipment" is a reference to the specifically identified devices and equipment found throughout paragraphs (C) through (F) at Ohio Adm.Code 4123:1-5-14. It is also clear that a hook safety latch is not among the devices and equipment specified throughout (C) through (F).

{¶ 121} Accordingly, the magistrate concludes that Ohio Adm.Code 4123:1-5-14(G)(1), one of the two specific safety rules at issue here, does not provide notice to an employer that a hook safety latch is among the safety devices or load-carrying equipment that must be repaired or replaced.

{¶ 122} The specific safety rule at issue here, Ohio Adm.Code 4123:1-5-14(G)(1) cannot be read out of its context. That is, Ohio Adm.Code 4123:1-5-14(G)(1) must be read in the context of paragraphs (C) through (F) of Ohio Adm.Code 4123:1-5-14.

### Ohio Adm.Code 4123:1-5-15(B)

{¶ 123} As earlier noted, the second specific safety rule at issue here, Ohio Adm.Code 4123:1-5-15(B) must be read in the context of Ohio Adm.Code 4123:1-5-15(A) which defines the word "[e]quipment."

{¶ 124} In her corrected order, the SHO fails to address the significance of Ohio Adm.Code 4123:1-5-15(A)'s definition of "[e]quipment" on the safety rule at issue, i.e.,

Ohio Adm.Code 4123:1-5-15(B).  That is, the SHO failed to determine whether the hook or hook safety latch at issue can be viewed as "[e]quipment" within the meaning of Ohio Adm.Code 4123:1-5-15(A).  This failure was an abuse of discretion because relator cannot have violated the safety rule if the hook or hook safety latch is not the "[e]quipment" defined by Ohio Adm.Code 4123:1-5-15(A).

{¶ 125}  Accordingly, based upon the above analysis, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate the corrected order of its SHO mailed August 9, 2011 (with the exception of that portion of the order that vacates the SHO's order mailed August 3, 2011) and to enter a new order that, in a manner consistent with this magistrate's decision, determines that relator did not violate Ohio Adm.Code 4123:1-5-14(G)(1), and further determines whether or not relator violated Ohio Adm.Code 4123:1-5-15(B).  If the commission determines that relator violated Ohio Adm.Code 4123:1-5-15(B), it shall enter a new determination of the percentage penalty.


                                                /S/ MAGISTRATE
                                                KENNETH W. MACKE


**NOTICE TO THE PARTIES**

> Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).