[Cite as *State ex rel. Landers v. Indus. Comm.*, 2016-Ohio-2732.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Julie Landers, Adm. of the Estate of Charles B. Landers, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No.  15AP-58 |
| | : | |
| Industrial Commission of Ohio and Crane 1 Services, Inc., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on April 28, 2016

**On Brief:** *Hahn Loeser & Parks LLP,* and *Douglas J. Suter,* for relator.

**On Brief:** *Michael DeWine*, Attorney General, and *Lisa R. Miller,* for respondent Industrial Commission of Ohio.

**On Brief:** *LL Patterson LLC,* and *Lisa L. Patterson,* for respondent Crane 1 Services, Inc.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1}  Julie Landers as administrator of the estate of Charles B. Landers filed this action in mandamus seeking a writ to compel the Industrial Commission of Ohio ("commission") to grant an award for a violation of a specific safety requirement ("VSSR") as a result of the incident in which Charles B. Landers was killed.

{¶ 2}  In accord with Loc.R. 13 of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings.  The parties stipulated the

pertinent evidence and filed briefs.  The magistrate then issued a magistrate's decision, appended hereto, which contains detailed findings of fact and conclusions of law.  The magistrate's decision includes a recommendation that we deny the request for a writ.

{¶ 3}  Counsel for the estate of Charles B. Landers has filed objections to the magistrate's decision.  Counsel for the commission and counsel for Crane 1 Services, Inc., Charles Lander's employer, have each filed a memorandum in response.  The case is now before the court for a full independent review.

{¶ 4}  Landers and Tim Sutter were inspecting a 25 ton overhead crane while using a scissor lift to view the crane.  The controls for the crane indicated that the crane was turned off, but the crane still moved and struck the scissor lift.  Landers fell over 25 feet and was killed.  Sutter was able to hold on to the scissor lift, but was seriously injured.

{¶ 5}  The incident was investigated by William M. Murphy on behalf of Crane 1 Services, Inc.  Murphy concluded that the incident occurred as a result of the failure of the men to lock the controls for the crane in the "off" position.  Murphy also faulted the men for failing to disconnect the power to the crane.

{¶ 6}  The incident was also investigated by Brian Weiss on behalf of the Ohio Bureau of Workers' Compensation Safety Violation Investigation Unit.  Weiss concluded that the failure of the men to properly lock-out\tag-out the crane was a contributing factor.  Weiss also faulted the way a fall protection device was attached.

{¶ 7}  Finally, Weiss noted that the crane indicator and warning lights were not functioning.  Had the safety devices been properly functioning, the men could have been warned that the crane was moving or about to move.  This last issue is heavily emphasized by counsel for the estate.

{¶ 8}  Counsel for Crane 1 Services, Inc., argues that the failure of the men to use the lock-out/tag-out procedure was "the" proximate cause of the incident.  Actually the cause was the crane moving and striking the scissor lift.  Arguably the lock-out/tag-out procedure would have prevented this instead of reliance on a control device which said the crane was turned off.  However, having functioning warning devices might also have prevented at least some of the injuries sustained but only if the crane had not been de-energized.  The men would have known that the scissor lift was about to be struck and could have taken measures to protect themselves.  In brief, the men were not totally

responsible for the injuries suffered. Further, a VSSR can still be found where the injured employee made a mistake or did something wrong.

{¶ 9} Counsel for Crane 1 Services, Inc. says the failure to repair issues were not before the commission because Ohio Adm.Code 4123:1-5-14(G) was not specifically cited when the application for an award for a VSSR was filed. Ohio Adm.Code 4123:1-5-14(G) reads:

> **Specific requirements applicable to all paragraphs of this rule.** (1) **Defective safety devices or load-carrying equipment.**
> Defective crane safety devices or load-carrying equipment shall be repaired or replaced.
>
> (2) **Access ladders, stairways, and/or walkways**. Crane access ladders, stairways, and/or walkways shall be provided on all cranes.
>
> (3) **Maximum capacity**. The maximum capacity recommended by the manufacturer shall be posted on each crane.
>
> (4) **Warning signs**. Warning signs, "out-of-order" signs, or warning devices shall be placed on each crane under repair.

{¶ 10} However, when the hearing on the application was held, counsel for the estate indicated that all the sections of Ohio Adm.Code 4123:1-5-14 were to be considered.

{¶ 11} Counsel for the commission emphasizes that the standards for finding a VSSR are very high and that the commission properly found that the estate did not meet those high standards in its application.

{¶ 12} Counsel for the commission also emphasizes that the application for a VSSR did not cite to Ohio Adm.Code 4123:1-5-14(G) and argues that, as a result, the arguments about Ohio Adm.Code 4123:1-5-14(G) have been waived. Finally, counsel for the commission points out correctly that if the lock-out/tag-out procedure which was supposed to be used would have been used, the defective alarms would not have functioned anyway, but were unnecessary because the crane could not have moved without power.

{¶ 13} We view a number of factors as converging to cause this tragedy. However, we are unwilling to say a VSSR was proved before the commission as demonstrated in our magistrate's decision.

{¶ 14} We overrule the objections to the magistrate's decision. We adopt the findings of fact and conclusions of law in the magistrate's decision. We, therefore, deny the request for a writ of mandamus.

*Objections overruled; writ denied.*

BROWN and KLATT, JJ., concur.

---

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Julie Landers, Adm. of the Estate of Charles B. Landers, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No. 15AP-58 |
| | : | |
| Industrial Commission of Ohio and Crane 1 Services, Inc., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

### M A G I S T R A T E ' S   D E C I S I O N

### Rendered on January 29, 2016

*Hahn Loeser & Parks LLP,* and *Douglas J. Suter,* for relator.

*Michael DeWine*, Attorney General, and *Lisa R. Miller,* for respondent Industrial Commission of Ohio.

*LL Patterson LLC,* and *Lisa L. Patterson,* for respondent Crane 1 Services, Inc.

### IN MANDAMUS

{¶ 15} Relator, Julie Landers, as the Administrator of the Estate of Charles B. Landers ("Landers"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order which denied relator's application for an additional award for a violation

of a specific safety requirement ("VSSR"), and ordering the commission to grant her application.

Findings of Fact:

{¶ 16} 1. On March 8, 2011, Landers and Tim Sutter, both employees of respondent, Crane 1 Services, Inc. ("Crane"), were performing an inspection of a 25-ton overhead crane, located at Allegheny Ludlum Steel ("Allegheny Steel") in New Castle, Indiana.

{¶ 17} 2. It is undisputed that both Landers and Sutter underwent various safety training with the Occupational Safety and Health Administration ("OSHA"), Crane, and Allegheny Steel before they inspected the crane. This was not their first time to inspect this particular crane. It is also undisputed that, although the crane controls were placed in the off position, neither Sutter nor Landers performed the lockout/tagout procedures prior to inspecting the crane.

{¶ 18} 3. The crane being inspected was an overhead crane which moved on rails on each side of the crane and was operated by remote control. Sutter and Landers used a scissor lift to inspect the rails and, at the time of the accident, they were approximately 26 feet in the air. During the inspection, the crane was activated, moved along the rails, struck the scissor lift, causing it to fall. Landers was thrown from the lift and died at the scene. Sutter remained in the lift, and suffered serious injuries.

{¶ 19} 4. On February 26, 2013, relator filed an application for an additional award for VSSR alleging violations of the following Ohio Administrative Code sections:

> Ohio Adm.Code 4123:1-5-05(D); 4123:1-5-14(C)(1)(c), (D), (e); 4123:1-5-14(D)(2)(b); 4123:1-5-14(E)(2)(b); 4123:1-5-14(F)(2)(b); 4123:1-9-01; and 4123:1-9-05.[1]

{¶ 20} 5. William M. Murphy worked for OSHA for 30 years before he began his own safety services. Mr. Murphy investigated the case and completed a report which was submitted to the commission. Mr. Murphy concluded further that the failure of Landers and Sutter to disconnect the power to the crane caused their injuries. Crane had complied with Ohio Adm.Code 4123:1-5-05(D)(5), which requires the employer shall furnish and

---

[1] Relator, through her authorized representative, verbally dismissed from consideration the allegation for violations of Ohio Adm.Code 4123:1-9-01 and 4123:1-9-05.

employee shall use a device to lock the controls in the "off" position when machines are shut down for repair, adjusting or cleaning. Specifically, in his June 30, 2014 report, Mr. Murphy discussed Adm.Code 4123:1-5-05(D)(5) and stated:

> Crane 1 had a written LOTO [Lock Out/Tag Out] program that met the above ORC[2] code (Dottery exh. 3), had given the decedent and Tim Sutter a copy of the safety manual (Julie Landers pull-guard 49) which contained the LOTO program therein (Dottery page 30, 51), provided lock out equipment including a lock and hasp, (Blind page 56), and had trained employees, including the decedent and Tim Sutter (OSHA file pg. 89), in the LOTO program. The decedent and Mr. Sutter failed to implement the LOTO program and apply their lock to the electrical disconnect of the crane before placing themselves in danger of the lift being struck by a moving crane. The crane moved and struck the scissors lift from which they were working. Had they implemented the LOTO program as prescribed by the Crane 1 LOTO program, the crane would not have moved, even if they unintentionally attempted to operate the crane remote control to move the crane.
>
> The Crane 1 LOTO program included provisions that required lockout devices to be issued to employees, training of employees in the implementation of the LOTO program and enforcement of the use of lockout devices. The decedent and Tim Sutter had been provided LOTO equipment and trained on the requirements of [the] program. Further, as Crane 1 managers visited job sites they at times conducted audits to monitor implementation of the LOTO program.
>
> **I have formed the opinion within a reasonable degree of professional certainty that Crane 1 did, as required by the above referenced ORC code, furnish the decedent with a device to lock the controls of the east bay crane in the "off" position. The decedent's failure to disconnect the power to the crane on which he was helping service technician Tim Sutter inspect and, as required by the above referenced ORC code, his failure to apply his lock to the disconnect switch to hold the switch in the "off" position, caused the injuries that he suffered on**

---

[2] This appears to be a typographical error and should read Ohio Adm.Code section and not Ohio Revised Code section.

**March 08, 2011. Had the decedent done so he would
not have been injured.**

(Emphasis sic.)

{¶ 21} 6. Brian Weiss, an investigator with the Ohio Bureau of Workers'
Compensation ("BWC") Safety Violations Investigation Unit, investigated the incident. In
his August 15, 2013 report, investigator Weiss specifically stated:

> [Six] Witness (co-worker) Timothy Sutton [sic] stated in an
> interview at the hospital, he set the on/off selector switch of
> the overhead crane's remote radio control in the "off"
> position. After doing so, he placed the crane controller on the
> floor of the scissor-lift's work platform. He then stated, they
> did not disconnect the power of the floor disconnect to the
> runway electrification and the crane manual disconnect. The
> floor power to the overhead crane was not disconnected,
> prior to raising the scissor-lift to the girder height. The raised
> scissor-lift was positioned parallel to the crane girders in
> order to inspect the mechanical components.
>
> * * *
>
> [Nine] Within the employer's investigation report analysis,
> based on what is known from their investigation reports *the
> primary cause of the incident was the movement of the
> crane/hoist towards the raised or extended lift.* The lift was
> extended upwards to a height of approximately twenty six
> feet (26') from the work base. This measurement was taken
> by Indiana OSHA as the lift was lying on the floor. *When the
> movement of the overhead crane came into contact with the
> lift, the lift toppled over and crashing to the concrete floor,
> thereby causing the fatality of Mr. Landers and serious
> injuries to Mr. Sutton* [sic].
>
> [Ten] *The secondary cause of the incident,* as reported in the
> internal investigation conducted by Crane 1 *indicates the
> mainline power was not turned off or disengaged at the
> lockable disconnect located at the floor level. Also it was
> determined that the mainline power to the lockable
> disconnect, located on the bridge controls, was also not
> disconnected. This would indicate a failure to properly lock-
> out and/or tag-out the overhead crane.*

[Eleven] *An additional contributing factor identified was the failure of the decedent to properly attach the fall protection lanyard to the scissor-lift.* Mr. Landers did in fact have his safety harness on, but evidence indicates the harness and lanyard were not attached to the man-lift at the time, thereby allowing him to be thrown out of the lift just prior to the lift striking the ground.

[Twelve] *Another potential contributing factor* as stated in the Crane 1 Services investigation report *identifies the inspection report on the crane, dated January 14, 2011 and inspected by Mr. Landers and by Mr. Sutter noted, "the crane indicator and warning lights to the bridge were not functioning" and the condition noted it as a "required repair."* The Crane 1 Services investigation report stated, if this condition had been repaired, the warning horn should have actuated when the controls were turned to the "on" position. The report also stated, witnesses did not report hearing the warning horn device. If the radio unit were correctly turned "off," as reported by Mr. Sutter, then subsequently turning it "on" would have actuated the warning horn and all would have been alerted.

(Emphasis added.)

{¶ 22} 7. Relator's application was heard before a staff hearing officer ("SHO") on July 7, 2014. Ultimately, the SHO determined that relator did not establish the applicability of a specific safety requirement and a VSSR. The SHO order provides the following citation, discussion, evaluation, and application of the various Ohio Administrative Code provisions, which relator alleged were violated.

**Ohio Adm.Code 4123:1-5-05(D) reads as follows:**

(D) Machinery control.

(1) Disengaging from power supply.

Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment.

(2) When machines are shut down.

The employer shall furnish and the employees shall use a device to lock the controls in the "off" position or the employer shall furnish and the employees shall use warning tags when machines are shut down for repair, adjusting, or cleaning.

(3) Mechanical belt shifters.

Tight and loose pulleys shall be equipped with mechanical belt shifters.

(a) Cone pulley drive belts.

Cone pulley drive belts shall be equipped with a mechanical belt shifter permanently attached.

(b) Where any part of the lower cone pulley is seven feet or less above the floor, the belt and pulley shall be guarded.

(4) Treadles or extensions.

Treadles or extensions for starting machinery shall be so located or guarded as to minimize exit and/or tripping.

### SHO Analysis

It is the finding of the Staff Hearing Officer that the Claimant has failed to demonstrate that the Employer violated Ohio Adm.Code 4123:1-5-05(D). Specifically, the Hearing Officer finds that sections 4123:1-5-05(D)(3)(4) are not applicable to the employment being performed by Charles Landers, deceased, on 03/08/2011, at the time that the industrial accident occurred. The crane being inspected did not have any type of pulley system or cone pulley drive belts on it. Further, the accident did not occur as a result of an accidental tripping over treadles or extensions used for starting a crane.

It is the finding of the Staff Hearing Officer that the employer of record did comply with Ohio Adm.Code 4123:1-5-05(D)(1) and (2). Specifically, the Hearing Officer finds that Mr. Landers, deceased, and his co-worker were previously provided tags and locks to be used in disengaging the crane to be inspected from its electrical power supply. Further, the employer of record provided training to its

employees, including Mr. Landers and his co-worker on the proper procedure in using "tag-out and lock-out." Not only was Mr. Landers and his co-worker trained by the employer of record in tag-out/lock-out, they were also trained by a situs employer, Alleghany Steel. Mr. Sutter, who was Mr. Landers' co-worker at the time of the accident, testified that all contractors working at an [sic] Alleghany had to undergo safety training with Alleghany Steel. Upon completion of their safety training, the contractor received a sticker to be placed on his hard hat so that it was known to Alleghany officials that that contractor had undergone the required safety training. Mr. Landers underwent this training on 03/08/2011. He underwent the training on the day of the accident due to the fact that it was his first time to work at that Alleghany site. After the accident occurred, Alleghany Steel officials and Crane-1 supervisors inspected the accident site, and noted that the "tag-out/lock-out" procedure had not been used on the crane that was being inspected by Mr. Landers and Mr. Sutter. Photos taken by investigators of the accident site shows [sic] red locks lying in the basket/work platform of the tipped scissor lift used by Mr. Landers and Mr. Sutter. Mr. O'Flaherty testified, at the hearing on 07/07/2014, that the locks shown in the picture were the same type of locks provided to his employees to be used for the lock-out procedure of a power source to a crane. Mr. O'Flaherty also testified that he distinctly remembered providing Mr. Landers with such a lock. Mr. O'Flaherty also testified that no tag-out or lock was used to turn off and disconnect the electrical power supply to the crane that was being inspected by Mr. Landers and Mr. Sutter on 03/08/2011. Mr. Sutter testified that he did not remember if he or Mr. Landers had locked out or disengaged the power supply. He was unable to remember due to injuries he sustained during the accident. The Hearing Officer finds that Mr. Landers was supplied with a lock to be used to disengage the electrical power supply to the overhead crane that was being inspected on 03/08/2011. Further, Mr. Landers was provided training by both the employer of record and Alleghany Steel on the proper method to tag-out and lock-out the power supply to cranes so that its power supply would be completed [sic] disengaged. Further, for reasons unknown, Mr. Landers and Mr. Sutter did not follow the tag-out/lock-out procedure. Further, the Hearing Officer finds that if the tag-out and lock-out procedure had been followed the power supply to the crane would have been disengaged and the crane would have never become activated.

**Ohio Adm.Code 4123:1-5-14(C)(1)(c), (d), (e) reads as follows:**

(C) Overhead electric traveling cranes.

The term "overhead electric traveling crane" shall mean a crane consisting of a bridge mounted on trucks which runs on rails and the hoisting mechanism mounted on a trolley which moves transversely across the bridge, and may be controlled from a cab or from remote or pendant controls.

(1) Equipment.

(c) Rail stops.

Rail stops shall be provided at both ends of crane runway and at ends of trolley travel.

(d) Bumpers.

A crane shall be provided with bumpers or other automatic means providing equivalent effect, unless the crane travels at a slow rate of speed and has a faster deceleration rate due to the use of sleeve bearings, or is not operated near the ends of bridge and trolley travel, or is restricted to a limited distance by the nature of the crane operation and there is no hazard of striking any object in this limited distance, or is used in similar operating conditions.

The bumpers shall be capable of stopping the crane (not including the lifted load) at an average rate of deceleration not to exceed three ft/s/s when traveling in either direction at 20% of the rated load speed.

A trolley shall be provided with bumpers or other automatic means of equivalent effect, unless the trolley travels at a slower rate of speed, or is not operated near the ends of bridge and trolley travel, or is restricted to a limited distance of the runway and there is no hazard of striking any object in this limited distance, or is used in similar operating conditions.

The bumpers shall be capable of stopping the trolley (not including the lifted load) at an average rate of deceleration

not to exceed 4.7 ft/s/s when traveling in either direction at 1/3 the rated load speed.

(e) Warning device.

On cab-operated cranes, a warning device or signal shall be provided for use in warning personnel of crane travel.

### SHO Analysis

It is the finding of the Staff Hearing Officer that the Claimant has failed to demonstrate that the Employer violated Ohio Adm.Code 4123:1-5-15(C)(1)(c), (d), (e). Specifically, it is the finding of the Staff Hearing Officer that the crane that was being inspected by Mr. Landers, deceased, and Mr. Sutter was an overhead electric traveling crane that did have rail stops on the ends of the crane runway. Further, the crane did have bumpers. Further, the placement of rail stops at the end of the rails used by the overhead crane being inspected had nothing to do with the cause of the accident on 03/08/2011. The Administrative Code requires that rail stops are to be placed at the end of overhead crane's rails upon which it travels. This is to prevent an overhead crane from falling off the overhead rails upon which it travels once it reaches the end of the rails. Further, the overhead crane at issue did have bumpers. The Hearing Officer also finds that the lack of bumpers was not the proximate cause of the accident. The bumpers would not have prevented the accident from occurring. The accident occurred because the electric source to the overhead crane had not been disengaged and locked out. Finally, the Hearing Officer finds that Ohio Adm.Code 4123:1-5-14(C)(1)(e) regarding [a] warning device does not apply to the accident at hand. That code section requires warning devices to be placed on a cab-operated crane. The crane that was inspected on 03/08/2011 was not a cab-operated crane. The cab had been removed from the crane years before. The crane at issue was an overhead electric travelling crane operated by remote control. Thus, the crane was not required pursuant to the cited section to have a warning device or signal to be provided for use in warning personnel of the crane's travel.

**Ohio Adm.Code 4123:1-5-14(D)(2)(b) reads as follows:**

(D) Electric jib cranes.

(2) Equipment.

(b) Rail stops.

Rail stops shall be provided at the outer end of jib boom.

### SHO Analysis

It is the finding of the Hearing Officer that this code section does not apply to the crane inspected and at use on 03/08/2011. Ohio Adm.Code 4123:1-5-14(D) applies to jib cranes. Subsection (1) of that code defines [the] electric jib crane as a crane designed for lifting or lowering a load within the scope of a horizontal circle spanned by a rotating arm or jib equipped with a stationery or travelling hoist block. As noted above, the crane at issue on 03/08/2011 was not a jib crane. It was an overhead electric traveling crane that was operated by remote.

**Ohio Adm.Code 4123:1-5-14(E)(2)(b) reads as follows:**

E) Electric single rail cranes and hoists.

(2) Equipment.

(b) Rail stops.

Rail stops shall be provided at the ends of crane runway.

### SHO Analysis

It is the finding of the Staff Hearing Officer that this code section does not apply to the industrial injury that occurred on 03/08/2011. Specifically, the crane that was inspected by Mr. Landers, deceased, was a dual rail electric crane suspended overhead. This code section applies to a hoist with or without an operator's cab, suspended from a single overhead track or rail. Further, as discussed above regarding rail stops the crane inspected on 03/08/2011 did have rail stops provided at each end of its runway.

**Ohio Adm.Code 4123:1-5-14(F)(2)(b) reads as follows:**

(F) Electric gantry cranes.

(2) Equipment.

(b) Bumpers, stops, and rail stops.

(i) A crane shall be provided with bumpers or other automatic means providing equivalent effect, unless the crane travels at a slow rate of speed and has a faster deceleration rate due to the use of sleeve bearings, or is not operated near the ends of bridge and trolley travel, or is restricted to a limited distance by the nature of the crane operation and there is no hazard of striking any object in this limited distance, or is used in similar operating conditions.

The bumper shall be capable of stopping the crane (not including the lifted load) at an average rate of deceleration not to exceed three ft/s/s when traveling in either direction at twenty percent of the rated load speed.

A trolley shall be provided with bumpers or other automatic means of equivalent effect, unless the trolley travels at a slow rate of speed, or is not operated near the ends of bridge and trolley travel, or is restricted to a limited distance of the runway and there is no hazard of striking any object in this limited distance, or is used in similar operating conditions.

The bumpers shall be capable of stopping the trolley (not including the lifted load) at an average rate of deceleration not to exceed 4.7 ft/s/s when traveling in either direction at 1/3 of the rated load speed.

(ii) Rail stops shall be installed on both ends of trolley travel.

## SHO Analysis

It is the finding of the Staff Hearing Officer that Ohio Adm.Code 4123:1-5-14(F)(2)(b) does not apply to the situation at hand. This cited code section applies to the use of electric gantry cranes. An electric gantry crane is a crane with the bridge mounted on structural legs which may be mobile on rails or stationery. One leg may be at ground level the other may be elevated or both legs may be at ground level. The crane that was inspected by Mr. Landers, deceased, on 03/08/2011 did not have legs and thus was not an electric gantry crane. The crane inspected was an

overhead electric crane mounted on a bridge attached to trucks that ran along rails at either end of the bridge.

Based upon the above stated facts and reasoning, the Staff Hearing Officer finds that there is no violation of a specified safety requirement and therefore, the Injured Worker's Application, filed on 02/26/2013, is denied.

{¶ 23} 8. Relator filed a motion for rehearing which was denied by order of the commission mailed December 13, 2014.

{¶ 24} 9. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 25} For the reasons that follow, it is this magistrate's decision that relator has not demonstrated the commission abused its discretion.

{¶ 26} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 27} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 28} In order to establish a VSSR, a claimant must prove that: (1) there exists an applicable and specific safety requirement in effect at the time of the injury; (2) the

employer failed to comply with the requirements; and (3) the failure to comply was the proximate cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972).

{¶ 29} The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193 (1983). Because a VSSR is a penalty, however, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989). The question of whether an injury was caused by an employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion test. *Trydle*; *State ex rel. A-F Industries v. Indus. Comm.*, 26 Ohio St.3d 136 (1986); *State ex rel. Ish v. Indus. Comm.*, 19 Ohio St.3d 28 (1985).

{¶ 30} In this mandamus action, relator does not challenge any of the factual findings made by the SHO. Instead, relator makes the following arguments: (1) the commission abused its discretion by not finding that the failure of operable visual and audible warning alarms on the overhead crane was a proximate cause of the injuries and the SHO should have applied Ohio Adm.Code 4123:1-5-4(G) to the facts of this case, and (2) neither Crane nor Allegheny Steel had supervisors to ensure that Landers and Sutter actually followed the lockout/tagout ("LOTO") procedures.

{¶ 31} Ohio Adm.Code 4123:1-5-4(G) provides:

> (G) Specific requirements applicable to all paragraphs of this rule.
>
> (1) Defective safety devices or load-carrying equipment. Defective crane safety devices or load-carrying equipment shall be repaired or replaced.
>
> (4) Warning signs.
>
> Warning signs, "out-of-order" signs, or warning devices shall be placed on each crane under repair.

{¶ 32} It is undisputed that relator did not list this code section in her VSSR application. Nevertheless, relator argues that this section applies to all cranes and it is

immaterial that she failed to include this code section in her application.  Because counsel raised this issue at the hearing, relator asserts that the SHO's failure to discuss this code section constitutes an abuse of discretion warranting the issuance of a writ of mandamus.

{¶ 33} Relator cites this court's decision in *State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.,* 10th Dist. No. 11AP-1083, 2013-Ohio-4381, and argues that this court held that "the duty to repair or replace defective crane safety devices under OAC 4123:1-5-14(G) applies to each and every crane described in OAC 4123:1-5-14."  (Relator's Brief, 15.)  This is part of relator's argument that it was immaterial that she failed to cite this as a violation in her application.  For the reasons that follow, the magistrate disagrees.

{¶ 34} First, the claimant in *Precision Steel* specifically cited Ohio Adm.Code 4123:1-5-14 in the VSSR application whereas here, relator did not.

{¶ 35} Second, in *Precision Steel,* the lack of a latch or clip on the hook allowed the 8,000 pound magnet to slip off the hook and crush the claimant's hand.  Here, failure to follow the LOTO procedures allowed the crane to be energized and hit the scissor lift.

{¶ 36} Third, and most importantly, the Supreme Court of Ohio reversed this court and found that the commission and this court construed the cited provision too broadly stating that "Nothing in subsections (C) through (F) of Ohio Adm.Code 4123:1-5-14 refers to a hook on a crane or hoist. There is no language in the rule that plainly apprised Precision Steel that a latch on a crane hook constituted either a 'safety device' or 'load-carrying equipment' for purposes of Ohio Adm.Code 4123:1-5-14(G)(1). As such, there could be no VSSR for failure to provide a latch on the crane hook." *State ex rel. Precision Steel Servs. v. Indus. Comm.,* ___ Ohio St. ___, 2015-Ohio-4798, ¶ 19.

{¶ 37} To the extent relator uses this court's decision in *Precision Steel* to assert that "the duty to repair or replace defective crane safety devices under OAC 4123:1-5-14(G) applies to each and every crane described in OAC 4123:1-5-14," relator's argument fails.  As such, the magistrate finds the commission did not abuse its discretion when it found that Ohio Adm.Code 4123:1-5-14(C)(1)(e) regarding warning devices did not apply.

{¶ 38} In her reply brief, relator argues that Landers and Sutter had to keep the crane energized in order to inspect it fully. Crane's Operations Manager, Tom O'Flaherty, testified that part of the inspection required Landers and Sutter to test all warning devices.  Sutter also testified that testing the warning devices was part of the inspection.

Relator then implies that the reason the remote control for the crane was found on the floor of the lift is evidence the crane had to be energized in order to be inspected.

{¶ 39} Relator's argument ignores the following: (1) every witness testified that the failure of Landers and Sutter to follow the LOTO procedure on the crane caused the injuries; (2) both Landers and Sutter already knew the warning lights/alarm did not work; (3) this was not a cab-operated crane but was a standby, remote controlled crane; and (4) the warning lights/alarm could have been tested from the ground before the LOTO procedures were performed and before Landers and Sutter entered the scissor lift.

{¶ 40} Relator's second argument is that Crane's failure to have managers on site in Indiana at Allegheny Steel to supervise whether or not its employees were following the LOTO procedures relieved Landers and Sutter from the responsibility of following those procedures. Specifically, relator points to the following section of Crane's LOTO procedures:

### Responsibilities

> The division manager shall ensure the implementation and compliance with the provisions of the lockout/tagout procedure. Other employees may be designated to assist in compliance. The operations manager or another designated manager shall provide employee training, issue all locking devices, and inspect for compliance.

(Emphasis sic.)

{¶ 41} It is undisputed that Crane required its employees to complete the ten-hour OSHA course which included LOTO training, that Crane also trained its employees in the LOTO procedure and provided each employee with a copy of the handbook, and that Allegheny Steel further required LOTO training. In fact, before employees of Crane were permitted to perform their work assignments, Allegheny Steel required them to get instruction and they were given a sticker for their helmet only after they had completed that training. Further, it is undisputed that Allegheny Steel was a 1-hour and 45 minute drive from Crane's Ohio facility and that Landers and Sutter drove there on the day they sustained their injuries. No manager was assigned to travel with them.

{¶ 42} The Ohio Adm.Code section at issue requires the employer provide certain equipment necessary for employees to follow the LOTO procedures and the employees are required to use that equipment and follow the LOTO procedures. Relator appears to argue that where employers comply with the code provision and provide the requisite safety equipment, Crane's own policy relieves employees of the responsibility of following the code provision if a manger or supervisor is not present to observe that its employees actually perform in a manner consistent with their training.

{¶ 43} There is nothing in the Ohio Adm.Code requiring that supervisors be present to ensure employees are complying with safety provisions. As such, this cannot constitute grounds for finding a VSSR.

{¶ 44} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it determined that she did not meet her burden of proving a violation of a specific safety requirement and denying her application.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).